# Richmond

## MARVIN MAURICE MUNDY

v.

## COMMONWEALTH OF VIRGINIA

No. 0221-88-2

Decided April 3, 1990

Affirmed *En Banc* December 18, 1990

COUNSEL

Steven D. Benjamin, for appellant.

Robert B. Condon, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

**COLE, J.**—Marvin Maurice Mundy was convicted of capital murder, murder, robbery and three counts of use of a firearm in the commission of a felony. On appeal, Mundy contends that (1) the trial court erred in refusing to suppress the second and third statements he made to the police, (2) the evidence was insufficient to convict him of capital murder, and (3) the trial court erred in refusing to grant his motion for a new trial based upon after-discovered evidence. Finding no merit in these arguments, we affirm.

Shortly after midnight on April 8, 1987, Mundy and three accomplices, Keith Cox, Michael Lyons and Norris Timmons, arrived by car at the Residence Inn Hotel on Dickens Road in Henrico County for the purpose of robbing it. Timmons stayed with the vehicle while the others approached the hotel on foot. The defendant carried his own .45 caliber revolver, Cox had a .357 caliber revolver which belonged to his mother, and Lyons was armed with a .22 caliber revolver.

The three men entered the hotel. Jack Marshall, the night auditor, was the clerk on duty at the time. Mundy pulled out his handgun and told the clerk to lie down on the floor. Marshall complied with the order. Mundy directed Cox to keep Marshall covered and he did so by holding his gun to the back of Marshall's head. Mundy emptied the contents of the cash register but was unsuccessful in opening a small hotel safe. Ordering Cox and Lyons to watch Marshall, Mundy picked up the safe and left the hotel with it.

Meanwhile, outside the hotel, Ronald E. Rigney, a Henrico County police officer on routine patrol, observed a Honda automobile parked parallel to the Residence Inn Hotel and partly out in the roadway. Rigney pulled up behind the vehicle and observed that the trunk was open. The male in the driver's seat exited the vehicle and approached the officer, who asked for identification but was furnished none. The officer attempted to look into the car trunk, but Timmons slammed the trunk door shut. According to the testimony of Rigney, Timmons appeared nervous and continually looked over his shoulder in the direction of the hotel office. While speaking with Timmons, the officer observed three males exit the motel, running toward him. The lead male appeared to see the officer. He turned around and ran back toward the hotel

office. Officer Rigney immediately called for assistance from other officers in the area.

Moments after leaving the hotel with the safe, Mundy returned without the safe and told Cox and Lyons that the police had Timmons. He then twice ordered Cox to shoot Marshall. When Cox hesitated, Mundy pointed his gun at Cox and said, "If you don't kill him I am going to kill you." Cox shot Marshall at point-blank range in the back of the head with his .357 caliber revolver, killing him instantly. Immediately after shooting Marshall, Cox ran out of the hotel and fled. Cox managed to hide his gun behind the front wheel of a car in the parking lot of a nearby hotel. Cox was apprehended by the police as he attempted to scale a fence along an adjoining interstate highway.

Mundy and Lyons followed Cox out of the hotel. As they were leaving, they encountered an arriving traveler, later identified as Ross Kennedy. They followed Kennedy back into the hotel with the intention of taking his car keys so they could make an escape in his car. While he was using a telephone, Kennedy was shot with a .45 caliber revolver and subsequently died. One of the disputed issues in the case is whether he was shot by Lyons or Mundy. Both fled the hotel. The police apprehended Mundy and Lyons hiding on the roof of a nearby bowling alley and arrested them.

In a jury trial, Mundy was convicted and sentenced in accordance with the jury's verdict to two terms of life imprisonment plus seventy years in the penitentiary for the capital murder of Ross Kennedy, the murder of Jack Marshall, robbery, and three counts of use of a firearm in the commission of a felony. This appeal followed.

## I. *Admissibility of Statements*

Mundy made statements to the police on three separate occasions. He argues that the trial court erred when it admitted into evidence the second and third statements. An in-trial suppression hearing was conducted to determine the admissibility of the statements. For purposes of this motion, the parties made the following stipulations concerning the first statement: it was made at 6:02 a.m. on April 8, 1987; Detective East advised Mundy of his *Miranda* rights; Mundy answered questions for a short period of time and then requested counsel; a second request for counsel was

made, but the questioning continued; East in no way threatened Mundy and did nothing to intimidate him; East did not promise Mundy anything for his statement or answers; East did make statements that the other co-defendants had been arrested and had made statements incriminating Mundy. Upon completion of the first statement, Mundy was taken to a different area, the third floor of the Public Safety Building. At the time he was taken to the third floor, there is no evidence that the police intended to resume interrogation.

The parties further stipulated as follows: about three hours later, Mundy told Investigator G. E. Ross, who was on the third floor, that he wanted to talk to the detective who talked to him; East was brought to Mundy and Mundy stated that he wished to make a statement; East read the *Miranda* warnings to Mundy again and Mundy signed a waiver; Mundy made his second statement, the substance of which was reduced to writing by East; on April 9, 1987, Mundy, while present in the general district court, made it known to the Commonwealth's attorney that he wanted to talk to him; later in the day, the Commonwealth's attorney, together with Detective East, went to the visiting room of the county jail and Mundy was brought in; Mundy expressed his desire to talk further; the Commonwealth's attorney left and East again read Mundy his *Miranda* warnings; Mundy made his third statement, the substance of which was reduced to writing by East.

At the suppression hearing, the trial court made the three written statements a part of the record without objection. The court asked defense counsel whether Mundy claimed that he was threatened during the first interrogation. In response, defense counsel answered that the "interrogation was psychologically coercive." The trial court gave the defendant an opportunity to put on evidence "that he was coerced or that he was threatened or anything of that nature" in making the first statement to the police. Mundy declined the offer to put on additional evidence and defense counsel stated that the defendant would "rely simply upon the stipulation of facts in the transcript and narratives of the statements."

In argument on the motion to suppress, Mundy claimed that all three statements were inadmissible because they violated his fifth amendment and fourteenth amendment rights to remain silent. He argued that, although he was advised of his *Miranda* rights before

making each of the three statements, he was coerced into making the first statement because he had to use the bathroom and he was denied this right, resulting in personal discomfort. He further argued that he was coerced into making the first statement because the interrogators advised him that he had a right to an attorney, but refused to provide one on two occasions when he requested it. Mundy argued that he "let the cat out of the bag" by making inculpatory statements (in his first statement he confessed to being present and being a part of the robbery, but denied that he shot anyone), and that, as a consequence, the subsequent statements were also coerced. He further argued that the invalid first confession impaired his ability to make a valid waiver of his *Miranda* rights.

The Commonwealth at all times conceded that the first statement was inadmissible and never attempted to introduce it. It argued, however, that the first statement, although obtained in violation of Mundy's *Miranda* rights, was not coerced, that the second and third statements were initiated at the request of the defendant, that *Miranda* warnings were given before all the statements were obtained, that Mundy executed valid waivers before giving the second and third statements, and therefore, the second and third statements were admissible.

An accused has a right under the fifth and fourteenth amendments to have counsel present during a custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 474 (1966). In *Edwards v. Arizona*, 451 U.S. 477 (1981), the Supreme Court determined when interrogation may be resumed after the accused invokes his right to counsel during a custodial interrogation:

> [W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. . . . [A]n accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

451 U.S. at 484-85 (footnote omitted); *see also Correll v. Commonwealth*, 232 Va. 454, 462, 352 S.E.2d 352, 356, *cert. denied*, 482 U.S. 931 (1987).

The *Edwards* rule operates when interrogation has ceased after the accused has invoked the right to counsel during a custodial interrogation. Once he has asserted his right to counsel, subsequent interrogation, to withstand constitutional challenge, must satisfy two separate and distinct requirements. First, further discussions between the police and the accused must have been initiated by the accused. Second, the accused must have knowingly and intelligently waived his right to counsel. *Smith v. Illinois*, 469 U.S. 91, 95 (1984); *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983); *Correll*, 232 Va. at 462, 352 S.E.2d at 356.

The evidence is uncontradicted that the second and third statements given by Mundy were initiated by him, since he contacted the police and requested the conversations. We, therefore, must decide whether the waivers of the *Miranda* rights obtained before the two statements were knowingly and intelligently given. Mundy contends, for the reasons previously stated, that the first statement obtained by the police was coerced and not voluntary. He argues that the coercion tainted the two subsequent statements as "fruit of the poisonous tree," citing *Wong Sun v. United States*, 371 U.S. 471 (1963). He further asserts that the officers used means well-calculated to undermine his ability to exercise his free will at the time of the first interrogation, and given no choice, he answered questions and admitted his participation in the robbery. He maintains that having "let the cat out of the bag," he was left to confront the "psychological and practical disadvantages of having confessed." Thus, he argues that the subsequent waivers of his fifth amendment rights were not voluntarily and intelligently made, making the two statements inadmissible under the principles set forth in *Oregon v. Elstad*, 470 U.S. 298 (1985). We disagree.

In *Elstad*, the police came to Elstad's home to arrest him for burglary. The defendant was not read his *Miranda* rights, and in a discussion with one of the officers, stated, "Yes, I was there." Later, at the police headquarters, Elstad was read his rights and he gave a full, signed statement admitting his participation in the burglary. At his trial, he moved to suppress his oral statement and the signed written statement, contending that the initial statement

he made at his home "let the cat out of the bag" and tainted the subsequent confession as "fruit of the poisonous tree," citing *Wong Sun.* The trial court found that Elstad's written statement was given freely, voluntarily and knowingly after he had waived his right to remain silent and have counsel present, and that it was not tainted by the first statement. Following his conviction, Elstad appealed to the Oregon Court of Appeals. The state maintained that any conceivable "taint" had been dissipated prior to the written confession by the giving of the requisite warnings. The Oregon Court of Appeals reversed the conviction, stating the constitutional question to be "whether there was a sufficient break in the stream of events between [the] inadmissible statement and the written confession to insulate the latter statement from the effect of what went before." *State v. Elstad*, 61 Or. App. 673, 676, 658 P.2d 552, 554 (1983). The Oregon court concluded:

> Regardless of the absence of actual compulsion, the coercive impact of the unconstitutionally obtained statement remains, because in a defendant's mind it has sealed his fate. It is this impact that must be dissipated in order to make a subsequent confession admissible.

*Id.* at 667, 658 P.2d at 554.

The Oregon Supreme Court declined to review the decision of the Court of Appeals and the United States Supreme Court granted certiorari "to consider whether the self incrimination clause of the fifth amendment requires the suppression of a confession made after proper *Miranda* warnings and a valid waiver of rights, solely because the police had obtained an earlier voluntary but unwarned admission from the defendant." *Elstad*, 470 U.S. at 303.

■ In *Elstad*, the Supreme Court discussed the fundamental differences between the role of the exclusionary rule in fourth amendment cases and cases involving the prophylactic *Miranda* warnings under the fifth amendment, which are not themselves rights protected by the constitution but are measures to ensure that the right against compulsory self-incrimination is protected. *Id.* at 304-08. The Court said:

> If errors are made by law enforcement officers in administering the prophylactic *Miranda* procedures, they should not

breed the same irremediable consequences as police infringement of the Fifth Amendment itself. It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*Id.* at 309.

■ The Court concluded with the following holding:

We must conclude that, absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights.

*Id.* at 314.

The Supreme Court reversed, holding that "[t]here is a vast difference between the direct consequences flowing from coercion of a confession by physical violence or other deliberate means calculated to break the suspect's will and the uncertain consequences of disclosure of a 'guilty secret' freely given in response to an unwarned but non-coercive question." *Id.* at 312.

This case differs from *Elstad* in that it involves a failure by the police to cease questioning when the defendant requested counsel, as required by *Miranda*, rather than a failure to give the warnings. However, the same principles of law apply. A violation of *Miranda* occurred when the police ignored Mundy's attempt to invoke his right to an attorney. The first statement, however, was

not obtained by physical coercion or other deliberate means calculated to break the suspect's will. At the outset of the first interrogation, Mundy stated he had to use the bathroom, but the record does not show that any personal discomfort resulted. We have only defense counsel's unsupported argument that personal discomfort resulted. Mundy was advised that one of the charges against him was capital murder and that the penalty he faced was the electric chair. He also was advised that the other co-defendants had talked to the police and implicated Mundy. The interrogators said that they were trying to be fair and wanted to hear Mundy's side of the story, but they had been told that he was the one who shot Kennedy. The interrogators further told Mundy that they did not believe him and that they knew he was lying in several instances. Nothing in the record establishes that the officers lied to Mundy on any occasion.

We find nothing in the record to support Mundy's contention that his first statement was coerced. Mundy stipulated that Detective East in no way threatened him and did nothing to intimidate him. He further stipulated that East did not promise him anything for his statement or answers. The trial court made a finding that Mundy's first statement was not obtained by coercion, threats or force. We find that there is credible evidence in the record to support this finding.

Having reached the conclusion that the first statement was not obtained by coercion or compulsion, we are not bound to conclude that Mundy's second and third statements were irrevocably tainted by the failure to adhere to the commands of *Miranda*. Failure to administer *Miranda* warnings or to abide by the interrogation rules set by *Miranda* results in the suppression of any statements obtained. However, the *Miranda* case, though requiring suppression of admissions unlawfully obtained, does not require that subsequent statements or their fruits be discarded as inherently tainted. *Id.* In *Michigan v. Tucker*, 417 U.S. 433 (1974), the Supreme Court refused to extend the *Wong Sun* "fruits" doctrine to suppress the testimony of a prosecution witness whose identity was discovered because of a statement taken from the accused without the benefit of full *Miranda* warnings but involving no actual compulsion. The Court concluded that this unwarned questioning "did not abridge respondent's constitutional privilege . . . but departed only from the prophylactic standards

later laid down by this Court in *Miranda* to safeguard that privilege." *Id.* at 446. Since there was no actual infringement of the suspect's constitutional rights, the case was not controlled by the *Wong Sun* doctrine that "fruits" of a constitutional violation must be suppressed.

■ In *Elstad*, the Supreme Court held that the reasoning in *Tucker* applied with equal force when an alleged "fruit" of a noncoercive *Miranda* violation is the accused's own voluntary testimony. 470 U.S. at 308. "Once warned, the suspect is free to exercise his own volition in deciding whether or not to make a statement to the authorities." *Id.* The Court concluded:

It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*Id.* at 309.

■ In *Rodgers v. Commonwealth*, 227 Va. 605, 318 S.E.2d 298 (1984), the Virginia Supreme Court summarized the current status of the law in the Commonwealth on this issue:

The test for voluntariness derives from federal constitutional law relating to the Fifth Amendment as applied to the States through the Fourteenth Amendment. In *Stockton*, we relied upon *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973), and concluded that in order to determine whether a statement is voluntary, we must decide, *in light of the totality of the circumstances*, whether the statement is the product of an essentially free and unconstrained choice by its maker, or whether the maker's will has been overborne and his capacity for self-determination critically impaired. 227 Va. at 140, 314 S.E.2d at 381.

When the scope of review and the test for voluntariness are considered together, the question that confronts us on this appeal becomes apparent. We must here determine whether, in light of the *totality of the circumstances*, the trial court was plainly wrong in concluding that Rodgers' statement to the Chesterfield police was essentially a free and unconstrained choice on his part or, put another way, that his will was not overborne.

*Id.* at 609, 318 S.E.2d at 300 (emphasis added); *see also Harrison v. Commonwealth*, 3 Va. App. 260, 265-66, 349 S.E.2d 167, 170 (1986).

The record discloses that Mundy was advised of his *Miranda* rights prior to making the second and third statements, and that he waived his rights. Mundy knew that he was in a bad situation. He and three others had been apprehended minutes after robbing the Residence Inn, which resulted in the death of two persons. Mundy was apprehended by the police while hiding on the roof of a bowling alley a short distance from the murder scene. He had given the police a statement admitting his participation in the robbery, but denying that he had shot anyone. However, Mundy knew that he owned and had possession of the .45 pistol with which Ross Kennedy had been killed. He was told by the police that his accomplices were naming him as the triggerman who shot Kennedy. Under these circumstances, it is reasonable to infer that Mundy thought that it would be to his advantage to talk further to the police in order to strengthen his contention that he had not shot anyone. He had to explain to the police how Kennedy was killed by his handgun. Consequently, Mundy contacted the police and requested a further communication with the detective who interrogated him.

This conversation took place approximately three hours after the first inadmissible statement was taken. According to the testimony of Detective East, Mundy admitted that the four of them commenced talking about robbing the hotel while they were riding around together in the car. Mundy said that before he, Keith Cox, and Michael Lyons got out of the car at the Residence Inn, he and Michael Lyons switched guns. He gave Michael his .45 caliber pistol and Michael gave him his .22 caliber pistol. He related that Michael and Keith pulled their guns out and forced the clerk

to lie on the floor behind the counter. Mundy claimed that he picked up the safe while Cox and Lyons continued to hold the clerk on the floor, and went outside with it. He observed the police car, dropped the safe and started back to the hotel. However, according to his statement, before he reentered the hotel, he heard a shot. He went inside and told Cox and Lyons to "come on" and, as the three were leaving the hotel, a white male drove up in a car and went inside. Mundy said they decided to get the car keys from the guest and use his car for transportation. When they went back inside, the traveler was on the telephone. Mundy stated that Michael kicked the door open, and, as Mundy headed back outside, he heard one more shot. They all began to run. Mundy said he threw his .22 caliber pistol onto a roof and continued running until they climbed onto the roof of a bowling alley, where they were located by the police.

At 3:25 p.m. on April 9, 1987, Mundy made his third statement, which was substantially the same as the second, but which provided more details of the events. Mundy told the police officer that he knew that it looked bad for him and he wanted to get everything straight.

While we cannot discern the motivation of a person who elects to talk to the police, Mundy's statements clearly indicate that he initiated contact with the police on both occasions to offer an explanation that would exonerate him from the killing of Ross Kennedy. Because Mundy knew that it was his gun that had been used, he told the police he had switched guns with Michael Lyons. His statements, however, are contrary to evidence adduced by the Commonwealth.

■ In examining the totality of the circumstances surrounding a confession, a court must consider a myriad of factors, including the defendant's age, intelligence, background and experience with the criminal justice system, the purpose and flagrancy of any police misconduct, and the length of the interview. *Harrison*, 3 Va. App. at 265, 349 S.E.2d at 169-70. Mundy's argument that he was psychologically coerced is without merit. "[T]he Fifth Amendment privilege is not concerned with moral and psychological pressures to confess emanating from sources other than official coercion." *Kauffmann v. Commonwealth*, 8 Va. App. 400, 406, 382 S.E.2d 279, 282 (1989). Mundy may have been frightened and agitated, but police conduct did not cause his emotional state.

After evaluating the credibility of the witnesses and weighing the evidence under the totality of the evidence test, the trial court found that Mundy's second and third statements were not coerced but were voluntarily, knowingly and intelligently made. There is ample credible evidence in the record to support this holding.

 Further, we must make an independent evaluation of the evidence to determine whether the confessions were voluntary. In doing so, we may rely upon the observations of the trial judge and his findings of fact, except as to the ultimate issue of voluntariness. *Goodwin v. Commonwealth*, 3 Va. App. 249, 253, 349 S.E.2d 161, 163 (1986). Based upon our independent evaluation of the record in this case, we conclude that Mundy's will was not overcome, that his capacity for self-determination was not critically impaired, and that his last two confessions were the product of a free and unconstrained choice, and were, therefore, voluntarily, knowingly and intelligently made.

## II. *Sufficiency of the Evidence*

Mundy argues that the evidence was insufficient to convict him of the capital murder of Ross Kennedy. At the conclusion of the Commonwealth's evidence, Mundy moved to strike the evidence on the ground that the Commonwealth failed to prove beyond a reasonable doubt that he had killed Kennedy willfully, deliberately and with premeditation. The trial court overruled the motion.

 When considering the sufficiency of the evidence of a criminal conviction, we view all the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom. *Traverso v. Commonwealth*, 6 Va. App. 172, 176, 366 S.E.2d 719, 721 (1988). The judgment of the jury will not be disturbed unless plainly wrong or without evidence to support it. *Fadely v. Commonwealth*, 208 Va. 198, 202, 156 S.E.2d 773, 776 (1967). The credibility of witnesses and the weight to be given their testimony are questions for the jury. *Coppola v. Commonwealth*, 220 Va. 243, 252, 257 S.E.2d 797, 803 (1979), *cert. denied*, 444 U.S. 1103 (1980). The jury is not required to accept either the theory of the Commonwealth or that of an accused. A jury has the right to reject that part of the evidence believed by them to be untrue and to accept that found by them to be true. *Belton v. Commonwealth*, 200 Va. 5, 9, 104

S.E.2d 1, 4 (1958). These principles are well established in our jurisprudence.

At trial, Mundy's main contention was that he was not guilty of capital murder of Ross Kennedy because he did not fire the shot that killed him. In his brief, Mundy claims that Kennedy was shot twice and that only one conclusion was possible: the discharge from the .45 caliber handgun was not the fatal shot but only caused the graze wound found on Kennedy's back, and the fatal wound was caused by the unrecovered bullet from Cox's .357 caliber pistol, which had been fired twice. As proof that the .45 caliber handgun did not kill Kennedy, Mundy maintains that the .45 caliber bullet was a hollow point bullet designed to mushroom on impact, that the .45 caliber bullet retrieved by the police had not mushroomed, and that this proved that the .45 caliber bullet did not penetrate Kennedy's clothing, skin, tissue, muscle and bone, as did the fatal shot. Mundy's position is filled with inconsistences and is contrary to the testimony of other witnesses in the case.

Mundy's contention that Kennedy was shot twice is not established conclusively by the evidence. In his second statement, Mundy said that he heard only one shot. The medical examiner stated that it was possible, but unlikely, that the same bullet caused both wounds found on Kennedy's body. He refused to say that one bullet could not have caused both wounds. Mundy is correct when he states that the .45 caliber bullet had not mushroomed. However, the evidence did not establish conclusively that a hollow point bullet always mushrooms when it passes through the human body. The fact that the bullet had not mushroomed, therefore, did not conclusively prove that it was impossible for it to have been the bullet that went through Kennedy's body. The medical examiner could not say that the fatal bullet had passed through bone. Further, the police made an exhaustive search of the murder scene and found only one bullet.

Moreover, Mundy's theory was contradicted by other competent evidence before the jury. Lyons testified that he, Cox and Mundy got out of the car, that Mundy went to the trunk of the car and got his .45 caliber handgun and some bullets, and the three of them headed toward the Residence Inn. Lyons, who was with Mundy, testified that Mundy shot Kennedy with the .45 caliber handgun and that the gun was fired only once.

Additionally, the testimony of both Cox and Lyons discloses that after Cox shot Marshall, upon Mundy's command, Cox immediately took off running and fled the building. This evidence places both Cox and his .357 caliber revolver away from the scene at the time Kennedy was shot. Accordingly, there was affirmative evidence, which the jury was entitled to believe, that Kennedy was not shot by the .357 caliber handgun.

The ultimate issue for the jury was whether Mundy shot Ross Kennedy. By their verdict, they decided the factual issues against Mundy and decided that Mundy did kill Kennedy. We hold that ample credible evidence in the record supports the jury's factual finding beyond a reasonable doubt that Mundy shot and killed Kennedy.

 There also is ample evidence to support the jury's finding of premeditation.

> The question whether a defendant is guilty of a wilful, deliberate, and premeditated killing of the victim is usually a question for the jury to determine from all the facts and circumstances. The intention to kill need not exist for any specific length of time prior to the actual killing. "A design to kill may be formed only a moment before the fatal act is committed provided the accused had time to think and did intend to kill."

*Clozza v. Commonwealth*, 228 Va. 124, 134, 321 S.E.2d 273, 279 (1984)(citations omitted). The evidence revealed that moments after Mundy had ordered the killing of the hotel clerk, he shot the guest when he attempted to use the telephone. From these circumstances, the jury could reasonably infer that Mundy intended to kill all witnesses and anyone who might prevent his escape. The evidence supports the jury's finding that the killing was willful, deliberate and premeditated.

### III. *Newly Discovered Evidence*

Finally, Mundy contends that the trial court erred in refusing to grant his motion for a new trial based on newly discovered evidence. In support of his motion, Mundy filed an affidavit from his attorney and a transcript of the testimony of Serina Dodson in the Circuit Court of Henrico County on January 12, 1988, in the case

of *Commonwealth v. Timmons*. The Commonwealth did not file any counter-affidavits, but did file an answer denying that Mundy had met the requirements for a new trial on the basis of newly-discovered evidence.

■ Because of the need for finality in court adjudications, four requirements must be met before a new trial is granted based upon an allegation of newly discovered evidence: (1) the evidence was discovered after trial; (2) it could not have been obtained prior to trial through the exercise of reasonable diligence; (3) it is not merely cumulative, corroborative or collateral; and (4) is material, and as such, should produce an opposite result on the merits at another trial. *Odum v. Commonwealth*, 225 Va. 123, 130, 301 S.E.2d 145, 149 (1983); *see also Whittington v. Commonwealth*, 5 Va. App. 212, 215, 361 S.E.2d 449, 451 (1987).

■ Older cases imposed a fifth requirement for granting a new trial: the newly discovered evidence had to go to the merits of the case, and not merely to impeach the character of a witness. *Barsa v. Kator*, 121 Va. 290, 297, 93 S.E. 613, 616 (1917). This rule has since been abandoned as an absolute requirement. Instead, later cases hold that when the newly discovered evidence is confined to testimony concerning the bad character of a witness, or testimony which tends to impeach the witness by his own inconsistent statements made prior to trial but not under oath, or by evidence of other inconsistent facts, a new trial generally will not be granted. *See Powell v. Commonwealth*, 133 Va. 741, 751, 112 S.E. 657, 660 (1922).

■ However, where the newly discovered evidence consists of statements the witness himself has made after the trial, under circumstances which, if true, are sufficient to show that the verdict was based on noncollusive mistaken or perjured testimony, the weight of authority is in favor of granting the new trial. *Id.* at 752, 112 S.E. at 660.

In *Powell*, the Supreme Court, in discussing this rule, said:

> The courts properly require that it shall be made to appear affirmatively that the new evidence tending to show the mistake or the perjury, beyond question exists and is not a mere matter of belief or opinion, before they will grant the relief in such cases. . . . By the preponderance of authority it seems

to be sufficient if the court has evidence before it which establishes the existence of the evidence relied on to show the perjury or mistake in such a clear and convincing manner as to leave no room for doubt as to the existence of the evidence so relied on, and the court is satisfied that the evidence is not collusive, that it seems to be true, and ought, if true, to produce on another trial an opposite result on the merits.

*Id.* at 755-56, 112 S.E. at 661.

 Stated another way, newly discovered evidence which merely discredits, contradicts, or generally impeaches a witness is not a basis for granting a new trial. Testimony which merely indicates the bias of the witness, or which relates to the bad character of the witness, or which tends merely to impeach the witness on the basis of incidental matters occurring prior to trial and not under oath, does not constitute grounds for a new trial. However, if the newly discovered evidence contradicts the factual basis of a witness's testimony, a new trial may be granted when it appears that the newly discovered evidence has sufficient probative weight to produce a different result on retrial. 58 Am. Jur. 2d *New Trial* § 436 (1989).

 The Supreme Court consistently has stated that motions for new trial based upon newly discovered evidence are addressed to the sound discretion of the trial judge, are not looked upon with favor because of the obvious opportunity and temptation that arises for fabrication of such evidence, must be considered with special care and caution, and should be granted only with great reluctance. *Odum*, 225 Va. at 130, 301 S.E.2d at 149; *Lewis v. Commonwealth*, 209 Va. 602, 608, 166 S.E.2d 248, 253 (1969). The principle in *Powell* was reaffirmed in *Fout v. Commonwealth*, 199 Va. 184, 98 S.E.2d 817 (1957):

Deducible from the authorities are these principles: There must be *clear and convincing proof that the witness testified falsely at the trial*, and not merely proof that by reason of conflicting statements his testimony is unworthy of belief. Application for a new trial is addressed to the sound discretion of the trial court which has the opportunity of seeing and hearing the witness whose testimony is brought under attack, and the prime duty of determining whether he swore falsely at trial.

*Id*. at 192, 98 S.E.2d at 823 (emphasis added).

Mundy's position is that Michael Lyons' testimony provided the only evidence that Mundy shot Kennedy. However, Mundy argues, Lyons was biased because he had reached an agreement with the Commonwealth for a sentence to a specific term of years in exchange for his testimony. Lyons' credibility was, according to Mundy, a critical issue in the case. In this regard, he argues that the testimony of Serina Dodson impeaching the testimony of Lyons was important to Mundy's case. Mundy asserts that he used due diligence to ascertain evidence of this nature, but did not know about the testimony of Dodson until after his co-defendant, Norris Timmons, was tried. He maintains that, in view of the suspect credibility of Lyons, a different result would occur in the event he were granted a new trial. We disagree.

To constitute newly discovered evidence, the evidence must have been discovered after the trial. In his motion for a new trial filed in the trial court on February 4, 1988, Mundy alleged that, during pre-trial investigation, he discovered several persons who overheard Lyons tell others that he, not Mundy, shot Kennedy, and, despite the exercise of reasonable diligence, he was unable to discover the identity of any person to whom Lyons made such a statement. He further alleged that the testimony of others who overheard Lyons' statements would not have been admissible at trial. No explanation was given why the statements, if made by Lyons, would not have been admissible at trial to impeach Lyons' testimony. Mundy further asserted in his motion that he subsequently ascertained that Serina Dodson testified in the trial of Norris Timmons that Lyons told her that he shot Kennedy and that he told her that he and Keith Cox had agreed to "put it all on Marvin." The motion further alleged that Dodson described to Mundy's counsel the manner in which Lyons and Cox communicated while incarcerated, but gave no explanation of how this was done since they were incarcerated in different jails. Defense counsel filed an affidavit stating substantially the same facts. He asserted that, prior to trial, he learned that Michael Lyons had been overheard telling several people at the Richmond City Jail that he, not Mundy, had killed Ross Kennedy. He alleged that he was able to ascertain the identity of several people who overheard these remarks. He further stated that he let it be known among numerous people at the city jail and in other pertinent communi-

ties that he needed additional information regarding Lyons' admissions. In January, 1988, he learned counsel for Norris Timmons had found Serina Dodson.

It is not sufficient to say merely that the evidence could not have been discovered by the use of due diligence. The application for a new trial must set forth in affidavits facts showing what efforts were made to obtain the evidence and explaining why those efforts were to no avail. *Fulcher v. Whitlow*, 208 Va. 34, 38, 155 S.E.2d 362, 365 (1967); *Lewis*, 209 Va. at 608-09, 166 S.E.2d at 253. The allegations of the motion and the supporting affidavit show that, prior to trial, Mundy and his attorney were aware of the alleged admissions made by Lyons that he killed Ross Kennedy. In his affidavit, defense counsel said, "I was able to ascertain the identity of several people who overheard these remarks." No explanation is provided for why such witnesses were not subpoenaed to testify at trial. Counsel stated he let it be known at city jail and pertinent communities that he needed additional information regarding Lyons' admissions. The affidavit does not provide the names of persons he talked to at the city jail or what communities were involved.

The affidavit failed to support a motion for a new trial. The motion must allege facts, supported by affidavit, that support the contention that the newly discovered evidence could not have been discovered before the trial by the exercise of due diligence. The motion must set forth facts showing the lack of knowledge of such evidence, the efforts made to obtain it, and why those efforts failed. *Fulcher*, 208 Va. at 38, 155 S.E.2d at 365; *Lewis*, 209 Va. at 608-09, 166 S.E.2d at 253.

We find that the defendant did not use due diligence in this case to obtain the evidence and produce it at trial. In addition, during trial the knowledge of this evidence was not brought to the attention of the trial court and no motion for a continuance was requested. *Connell v. Commonwealth*, 144 Va. 553, 557-58, 131 S.E. 196, 198 (1926)("the party discovering such testimony should call it to the attention of the trial court").

At a post-trial hearing on the motion for a new trial, Mundy did not call Serina Dodson as a witness, but, by agreement of counsel, proffered the transcript of her testimony in the *Timmons* case, where she testified:

[Michael] said he went in — Michael, Marvin, and Keith Cox went into the Residence Inn. He went to the desk clerk and he told the desk clerk that "where's the safe," and the desk clerk said, "I don't have one," so he said, "You're going to give me something or I'm going to kill you." And someone walked in and scared Mike and he said, "I shot."

In addition to the testimony of Lyons, there is an abundance of evidence upon which the jury could conclude that Mundy shot Kennedy. The testimony of both Keith Cox and Michael Lyons placed the .45 caliber revolver in Mundy's hand during the commission of the crimes. There was evidence that the .45 caliber and .22 caliber handguns were recovered by the police along the attempted escape route of Lyons and the defendant. Lyons provided the police with the specific location of the .22 caliber handgun. The jury could infer from this evidence that Mundy, not Lyons, had possession of the .45 caliber revolver. Concerning the wound which killed Ross Kennedy, a pathologist in the Medical Examiner's Office testified that "[t]he dimensions . . . indicate a large caliber because it measured three-quarters by three-eights [sic] inch, which is a fairly large hole indicating large caliber." Other than the bullet found in Marshall's skull, a .45 caliber bullet was the only one found at the murder scene by the police after several intensive searches. From this evidence, the jury could reasonably conclude that Kennedy was killed by the .45 caliber and not the .22 caliber handgun.

We find that the trial court, assessing the credibility of Michael Lyons' trial testimony and the evidence adduced at the motion hearing, including the proffered statement of Serina Dodson, could reasonably conclude that the testimony of Dodson would not produce an opposite result on the merits at another trial. Dodson's testimony is inconsistent with the testimony of both Cox and Lyons and the facts as related by Mundy in his two statements to the police. The last sentence of her statement, "[a]nd someone walked in and scared Mike and he said, 'I shot' " is inconsistent with the version of the crimes given by the other witnesses. All the evidence in the case established that when Kennedy arrived, both Lyons and Mundy were outside the hotel. Kennedy then went into the hotel and Lyons and Mundy followed. Further, Dodson's statement does not say that Lyons shot anyone, and certainly does

not say that he shot Ross Kennedy. Dodson's statement is so vague, indefinite and contradictory that we, like the trial court, cannot attach much weight to it. She stated that she was afraid of both Lyons and Mundy and she thought that Mundy robbed her mother with the aid of Lyons. We believe that a jury could not give sufficient weight to the testimony of Dodson so as to make a difference in the event of a new trial.

The trial judge found that Serina Dodson's testimony was not newly discovered evidence and that even had the defendant put it in evidence, it would not produce a different result on retrial. Finding credible evidence in the record to support the findings of the trial judge, and, based upon our review of the record, we find that the trial court did not abuse its discretion in denying the defendant's motion for a new trial.

For the reasons stated, the judgments of the trial court are affirmed.

*Affirmed.*

Koontz, C.J., Baker, J., Duff, J., and Willis, J., concurred.

Coleman, J., with whom Moon, J. concurs.

I would affirm the judgments of the trial court, but for the reason that the admission of Mundy's statements into evidence, although erroneous because they were taken when he had not knowingly waived his fifth amendment right to counsel, were nevertheless harmless beyond a reasonable doubt. For the reasons more fully explained in Judge Benton's dissent to the panel opinion, I am of the view that Mundy's statements were made after he had invoked his right to have counsel present and at a time when the evidence fails to show that he had knowingly and voluntarily waived that right. However, Mundy's statements did not in any way tend to prove that he was the "triggerman" in either the capital murder charge or in the first degree murder charge, which was the only issue that Mundy actively challenged. Furthermore, there is no suggestion at trial or on appeal that, because Mundy's admissions were to be admitted in evidence, that he limited his challenge at trial to whether he was the triggerman and, as a result thereof, did not challenge his participation in the robbery or murder as a principal in the second degree. Thus, because Mundy's statements implicated him only to the extent that they tended to

prove that he was present and participated in the crimes, which facts he did not contest and which independent evidence clearly established, I fail to find that he was prejudiced by the admission into evidence of his involuntary statements which did no more than corroborate what had been independently established.

Benton, J., dissenting.

I would hold that the trial judge erred in refusing to suppress the "second" statement, and I would remand this case for a new trial. Because of inadequate evidence in the record concerning the circumstances leading up to and surrounding Mundy's third statement to the police, I would remand that issue to the trial court for a new suppression hearing.

In *Edwards v. Arizona*, 451 U.S. 477 (1981), the Supreme Court stated:

> [A]lthough we have held that after initially being advised of his *Miranda* rights, the accused may himself validly waive his rights and respond to interrogation, the Court has strongly indicated that additional safeguards are necessary when the accused asks for counsel; and we now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

*Id.* at 484-85 (citation and footnote omitted). A plurality of the Supreme Court explained in *Oregon v. Bradshaw*, 462 U.S. 1039 (1983), that reinitiation of interrogation after an accused has invoked the right to counsel requires, in addition, proof of a waiver of the right to counsel:

> [W]e held that after the right to counsel had been asserted by an accused, further interrogation of the accused should

not take place "unless the accused himself initiates further communication, exchanges, or conversations with the police." [*Edwards*,] 451 U.S. at 485. This was in effect a prophylactic rule, designed to protect an accused in police custody from being badgered by police officers in the manner in which the defendant in *Edwards* was. We recently restated the requirement in *Wyrick v. Fields*, 459 U.S. 42, 46 (1982) (*per curiam*), to be that before a suspect in custody can be subjected to further interrogation after he requests an attorney there must be a showing that the "suspect himself initiates dialogue with the authorities."

But even if a conversation taking place after the accused has "expressed his desire to deal with the police only through counsel," is initiated by the accused, where reinterrogation follows, the burden remains upon the prosecution to show that· subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation.

*Id.* at 1044. The question posed by this case is whether the police, in blatant disregard of the bright-line rule of *Miranda v. Arizona*, 384 U.S. 436 (1966), can flatly ignore two unambiguous requests for an attorney, continue to interrogate an accused for a substantial period of time, and then take advantage of the badgered accused who, having been told through the actions of the police that his request for an attorney will not be honored, seeks to fend for himself. I believe the majority's analysis misses the mark and I dissent.

When Mundy was arrested, he was interrogated at 6:02 a.m. by Detective Robert C. East and an assistant Commonwealth's attorney, Wade Kizer. At the beginning of the interrogation, Mundy twice requested permission to use the toilet. On the first occasion East said, "We'll get you to the bathroom in a few minutes," but continued the questioning. On the second occasion East stated, "Before I let you use the bathroom, I need you to do one thing, to consent to have a gun powder test on your hands done." East then continued the questioning. Mundy was not permitted to use the toilet.

After obtaining Mundy's name, address, social security number, and date of birth, East informed Mundy that he was charged with

robbery and capital murder, and he read *Miranda* warnings to Mundy. After East explained the consequences of capital murder, Mundy denied killing anyone and answered East's questions concerning his whereabouts that night. The following exchange then occurred:

East: Where were you all at, where were you all at, where did you meet up with at?

Mundy: I want to see my lawyer.

East: You want to wait to see your lawyer?

Mundy: Yeah.

East: Okay. You want to tell me about why you were up on the bowling alley roof? Where the police officers caught you?

Mundy: I want to wait till I see my lawyer.

East: Wait till you see your lawyer, okay. You understand all is involved here? You've been in trouble a lot haven't you?

East failed to honor Mundy's request to see a lawyer. Instead, he continued to question Mundy extensively in an interrogation that encompassed nineteen typed pages of transcript (the interrogation is attached as an appendix). The assistant Commonwealth's attorney who was present and actively participated in much of the interrogation described what followed:

After that statement was concluded and Mr. Mundy was removed to a different part of the building on the same third floor, approximately three hours later at approximately 9:00 a.m. on April 8, 1987, Investigator G.E. Ross, who had been up there on the third floor during this entire period of time came to me, told me that Mr. Mundy had told him that he wanted to talk to me. Detective Ross told me that Mr. Mundy was laboring under the false impression that I was an investigator. He said he wanted — words to the effect that, "I want to talk to that first detective who talked to me," described me physically. Detective Ross came and got me. I went to the area where Mr. Mundy was. I did not tell him the fact what my true position was, didn't tell him anything about what my occupation was. I asked him merely did he say that he wanted to talk to me. He said, "Yes, I want to tell you what happened." I said, "Fine." We moved Mr. Mundy into a sergeant's office on the third floor.

I went and got Detective East, brought him into the room. I asked Mr. Mundy again, I said, "Is it your desire and did you approach me and say that you wanted now to make a statement." He said, "Yes." I said, "This is Detective East. It's his case. If you want to make a statement I would rather you make it to Detective East." Mr. Mundy consented. I left the room. Detective East advised the Defendant of his Miranda Warnings again. The Defendant made a waiver and the second statement occurred, that is the statement that has been reduced to writing and provided to the Defendant, or the substance of the statement has been reduced to writing.

East testified that during that session Mundy "was orally advised [of *Miranda*]." For unexplained reasons, neither East nor the assistant Commonwealth's attorney recorded the second session with Mundy. East did not take notes of the interrogation "at that time." At the conclusion of the interrogation, East left the room, went to his desk, and "wrote out what we had discussed."

Although the trial judge suppressed the "first" statement, he should also have suppressed the "second" statement. On this evidence, the Commonwealth has failed to prove that the first interrogation of Mundy ceased. Mundy's requests for an attorney were twice ignored. The interrogation continued at length. Following that session, Mundy simply "was removed to a different part of [the Public Safety] building on the same third floor." There is no indication that he was in a cell or away from the further querying of the police. We only know that three hours after the "first" questioning began "Investigator . . . Ross, who had been up there on the third floor during this entire period of time," told the assistant Commonwealth's attorney, who had interrogated Mundy, that Mundy wanted to speak to him. On this evidence, the questioning that occurred from 6:03 a.m. to 9:30 a.m. was functionally equivalent to one interrogation.

Even if one allows that the interrogation can be separated into two discrete encounters, the Commonwealth has failed to carry its burden of showing that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation. Where reinterrogation occurs following the initiation of conversation by an accused who previously has invoked the right to counsel, the burden is on the Commonwealth to show that

subsequent events indicate a waiver of the right to have counsel present during the interrogation. *Bradshaw*, 462 U.S. at 1044. Such a waiver must be shown to be knowing and intelligent under the totality of circumstances, including the background and experience of the accused and the conduct of the police. *Correll v. Commonwealth*, 232 Va. 454, 464, 352 S.E.2d 352, 357, *cert. denied*, 482 U.S. 931 (1987). In analyzing whether Mundy subsequently waived his right to counsel, the majority fails to assess the impact of the interrogation where the police flagrantly disregarded Mundy's requests for counsel, thereby undoubtly giving Mundy (or any reasonable person) the impression that *Miranda's* conferral of the right to counsel is meaningless.

Both *Edwards* and *Bradshaw* assume cases where a request for counsel is made and is initially honored by the police. "*Edwards* established a bright-line rule to safeguard pre-existing rights." *Solem v. Stumes*, 465 U.S. 638, 646 (1984). When the police cease interrogation following invocation of the right to counsel, they send an unmistakable signal to an accused that the rights contained in the *Miranda* warning are real and will be honored. A subsequent interrogation initiated by the accused takes place against the background of rights that are real and respected by the police. In this case, two officers sworn to uphold the constitution, including an officer of the court, flagrantly disregarded Mundy's two requests for counsel despite having previously advised Mundy that he had a right to have counsel present during any interrogation.[1] By their conduct, these officers conveyed the unmistakable message that the *Miranda* "rights" are illusory and

---

[1] The conduct of the assistant Commonwealth's attorney in this matter is inexplicable. It appears that he participated in a deliberate, purposeful violation of Mundy's rights. He described to the trial judge his involvement in the interrogation:

I might add that during the initial questioning I had been present in the room. I had been called from home at approximately 2:00 that morning by Detective East and asked to respond to the Public Safety Building. He apprised me generally of what crimes had been committed, the fact that there had been two murders and a robbery at the Residence Inn and four people had been arrested. I was present during most, if not all, of the first statement that was taken by Investigator East. . . .

Although there may be possible explanations for the conduct of the assistant Commonwealth attorney, he offered none to the trial judge. I find on this record no acceptable explanations. Either he does not understand the fundamental teachings of *Miranda*, or he chose simply to disregard *Miranda's* teaching and his obligation to uphold the law of the land. In either case, his conduct is unacceptable and should be unequivocally condemned by this Court. His conduct raises serious questions concerning his view and understanding of his ethical responsibilities.

that any subsequent invocation of those rights would be treated in the same fashion, i.e., ignored.

Unlike the majority, I do not believe that *Oregon v. Elstad*, 470 U.S. 298 (1985), provides the proper framework for resolution of the issue in this case. *Elstad* involved the admissibility of a confession obtained after proper *Miranda* warnings following an earlier voluntary but unwarned statement from the defendant. The Supreme Court concluded that the subsequent administration of *Miranda* warnings sufficed to cure the earlier defect — the officers' failure to provide warnings — which had rendered the first statement inadmissible. 470 U.S. at 310-11. By contrast, the present case involves not a mere omission on the part of officers to provide *Miranda* warnings, but an affirmative disregard of the accused's invocation of the right to counsel and a continuation of interrogation in contravention of his rights. That the Supreme Court would distinguish this case from *Elstad* is evident from the *Elstad* majority's own recognition that "cases . . . concerning suspects whose invocation of their rights to remain silent and to have counsel present were flatly ignored while police subjected them to continued interrogation" are "inapposite." 470 U.S. at 313 n.3.

Having been given his *Miranda* warnings prior to the interrogation, Mundy was entitled to assume that the warnings conveyed genuine rights which, if asserted, would be honored. The continued interrogation by officer East and the Commonwealth's attorney following Mundy's expressed desire to consult with an attorney unmistakably conveyed a message which could not be erased by another similar warning. The Supreme Court recently recognized this fact in *Arizona v. Roberson*, 486 U.S. 675 (1988):

> To a suspect who has indicated his inability to cope with the pressures of custodial interrogation by requesting counsel, any further interrogation without counsel having been provided will surely exacerbate whatever compulsion to speak the suspect may be feeling. Thus, we also disagree with petitioner's contention that fresh sets of *Miranda* warnings will "reassure" a suspect who has been denied the counsel he has clearly requested that his rights have remained untrammeled.

*Id.* at 2100.

In addition to being voluntary, a valid waiver of counsel "must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege." *Edwards*, 451 U.S. at 482. Focusing primarily on the voluntariness of Mundy's admissions, in an attempt to fit this case within the purview of *Elstad*, the majority neglects to address whether the continued interrogation of Mundy, despite his repeated requests for counsel, undermined Mundy's ability to waive this right knowingly and intelligently when he was subjected to reinterrogation by the same officer three hours later. The continued questioning of Mundy unequivocally had the effect of demonstrating to Mundy that he had no choice but to submit to interrogation despite his invocation of rights. When the taping of the first statement ended, Mundy had not been told that his request for counsel would be honored. He was simply moved to another part of the third floor. To permit the police and the Commonwealth's attorney to ignore the request for counsel and to continue the interrogation to the point that the request for counsel had no meaning to Mundy or the interrogators simply invites even further contempt (such as was demonstrated in this case) for the *Miranda* rights and also invites ingenuity in inventing new schemes to denude constitutional rights.

Because I believe that the officers' conduct undermined the subsequent waivers, and because I believe that, under the totality of circumstances present in this case, the Commonwealth has failed to establish a knowing and intelligent waiver, I dissent.

## APPENDIX

East: What's your name?
Mundy: Marvin Mundy?
East: Huh?
Mundy: Marvin Mundy.
East: Marvin Mundy, the infamous Marvin Mundy.
Mundy: The bathroom.
East: All right, we'll get you to the bathroom in just a few minutes. Your middle name Marvin.
Mundy: Uh-huh.
East: No middle name, I can't hear you Marvin? Maurice. That's M-U-N-D-A-Y.
Mundy: Mundy?
East: M-U-N
Mundy: D-Y.

East: D-U-Y?
Mundy: D-Y.
East: D-U-I-E?
Mundy: D-Y-.
East: D-Y. Whats your address Marvin, I can't hear you Marvin,
Mundy: Whitcomb St.
East: Whitcomb St. Uh-huh,
Mundy: I need to use the bathroom bad.
East: All right, Marvin before I let you use the bathroom, I need you to do one thing, to consent to have a gun powder test on your hands done, you want do that?
Mundy: What?
East: A gun powder test on your hands, have your hands tested?
Mundy: All right.
East: They put ah, little strips on your hand, that's all, real quick you want to do that?
Mundy: Yeah.
East: Uh-huh, in just a few minutes. Okay, wait a minute. Okay, stand up by that wall. Okay, you sign right here saying that you'll let us do the test okay?
Mundy: I gonna do what?
East: Saying that your [sic] gonna let us do the gun powder test on your hand okay? Why do you do that, so I can take you over and get it done, so you can go to the bathroom. Okay, we'll do the test real quick, let you go to the bathroom. Don't have any left Marvin. I'll get you some when we go downstairs all right. I don't smoke. We'll see if we can get you one in a minute okay? What your address Marvin?
Mundy: 1907 Apt. #8.
East: 1907 Apartment what, apartment #8? What's your date of birth Marvin?
Mundy: 7-26-63.
East: 7-26-63. What's your social security number?
Mundy: (inaudible).
East: 239.
Mundy: (inaudible).

East: If you see anybody outside with a cigarette, I need to hold onto to that okay, sorry, what do you need out of it?

Mundy: (inaudible). Hold onto it, why?

East: Evidence.

Mundy: (inaudible).

East: Can't get into it right now, what you need out of it?

Mundy: Naw, I was going to use it because I'm cold.

East: Okay, I'm sorry, I have to hold onto it okay.

Mundy: Coat.

East: Yeah. Okay, Marvin let me explain something to you, first before we get talking or whatever you want to do, okay, this is, has your name up top, your address, today's date, the time right now being 6:02 a.m., says, I Marvin Maurice Mundy, have been advised, that I'm being interviewed by Investigator R. C. East. My code in the alleged commission of the crime of robbery and capitol [sic] murder. I've been advised that I have the right to remain silent. I've also been advised that if I do make any statements, it can be used against me in court. I have been further advised that, that I have the right to have an attorney present during this or any future interview. If I do not have funds to employ an attorney, the court will appoint one to represent me. Do you understand all your rights. Okay, need you to sign right there, saying that read you your Rights and you understand them, that's all it says, okay.

Mundy: Capitol [sic] murder,

East: Okay, I'll explain to you in a minute, what's going on. Marvin you understand what Capitol [sic] Murder is?

Mundy: No.

East: Capitol [sic] Murder in this case, is when somebody was killed during a robbery, which occurred and as a result someone died, okay. Do you know what the sentence is for Capitol [sic] Murder, if your convicted of it? What is it? Its either life imprisonment or death by the electric chair in Virginia.

Mundy: Yeah.

East: Yeah, you understand that, okay. Is there anything you want to tell me about what happened?

Mundy: I know I didn't kill nobody.

East: You know you didn't kill nobody. Tell me what happened, what went down?

Mundy: That's all I'm saying, I know I didn't kill nobody, but ah,

East: But you did rob somebody?

Mundy: No, I'm saying, I didn't kill nobody.

East: Okay, but you did rob somebody, I told you its robbery and capitol [sic] murder, you say you didn't kill nobody, did you rob somebody tonight?

Mundy: Didn't have nothing to do with that?

East: Do with what?

Mundy: With none of that.

East: None of that, who were you with tonight?

Mundy: I was with a friend.

East: You were with a friend, is that one of the friend's you were with? Whose that, huh, what's his name?

Mundy: Michael.

East: Michael what?

Mundy: Lyons

East: Michael Lyons?

Mundy: I don't know.

East: You don't know his last name, okay. Who is that?

Mundy: Norris.

East: Norris and who is that, Keith, what's Keith's last name?

Mundy: Cox.

East: Keith Cox, okay. You were with them tonight?

Mundy: Yeah.

East: What happened?

Mundy: Nothing happened.

East: Where were you all at, where were you all at, where did you meet up with at?

Mundy: I want to see my lawyer.

East: You want to wait to see your lawyer?

Mundy: Yeah.

East: Okay. You want to tell me about why you were up on the bowling alley roof? Where the police officers caught you?

Mundy: I want to wait till I see my lawyer.

East: Wait till you see your lawyer, okay. You understand all is involved here? You've been in trouble a lot haven't you?

Mundy: No, not nothing like this,

East: What was the last thing you were arrested for?

Mundy: For concealed weapon.

East: Concealed weapon, okay. You know who this is? Who is that?

Mundy: A friend.

East: A friend, who is it, huh?

Mundy: (inaudible).

East: Judson Calvin right? You know where he's at now?

Mundy: I don't know.

East: You know who did it?

Mundy: Did what?

East: Who killed him?

Mundy: No, no I don't.

East: You don't, doesn't bother you that he's dead huh, doesn't bother you that he's dead, you all supposed to have been friends, that's the way it goes, huh, that's the way it goes huh?

Mundy: I said it bothered me afterwards.

East: But it don't bother you no more?

Mundy: That something that happens,

East: Yeah?

Mundy: (inaudible)

East: What have you been taking tonight, what kind of drugs?

Mundy: Nothing.

East: You been drinking, you don't have no odor of alcohol on you?

Mundy: I don't?

East: No, what have you been drinking?

Mundy: Some Brass Monkey.

East: Some Brass Monkey, where were you drinking that at?

Mundy: Over a girl's house.

East: Over a girl's house? Your pouch, your pouch is in the trunk. your [sic] the oldest one in the group, your [sic] the oldes [sic] one in the group. Its word

on word, we've got enough evidence.

Mundy: Yeah, but I didn't kill anybody.

Kizer: Talk to anybody else, can you tell me exactly what happened, tell me when you all got together, went over to the motel, you know, (inaudible),

Mundy: (inaudible).

Kizer: (inaudible).

East: The couch, the couch is in the trunk.

Kizer: (inaudible).

East: Your [sic] the oldes [sic] one in the group, your the oldes [sic] one in the group?

Kizer: (inaudible).

East: Word on word, we've got enough evidence.

Mundy: I ain't saying nothing.

Kizer: (inaudible).

Mundy: In my car,

Kizer: Huh, which gun did you have? You had a gun, which one? Like this?

East: Is it as heavy as it looks?

Mundy: Yeah.

Kizer: How come you didn't get it out of the car, weren't you gonna take it from the car?

Mundy: Ut-uh [sic].

Kizer: Huh? Did you get any money out of the cash register?

Mundy: No.

Kizer: Where was the money?

Mundy: What money, come through there, I didn't see any money.

Kizer: You told the night clerk to open the cash drawer didn't you?

Mundy: No, it won't me did it, (inaudible).

Kizer: Michael and Keith? You didn't have a gun, is what your [sic] telling me? Who had the gun?

Mundy: I don't know, my gun was in the car.

Kizer: Was it your idea?

Mundy: I don't know. It won't my idea, talking, but it won't my idea.

East: Where were they talking about it at?

Mundy: In ah, let me see, (inaudible).

East: Where were you all over at Michael's house?

Mundy: Yeah.

East: On Winston St.?
Mundy: Yeah.
East: Did you talk about it over there?
Mundy: Yeah.
East: Where was his mother at, she won't there?
Mundy: No, she won't there.
East: She wasn't there.
Mundy: She came in though.
East: You all talked about it over there. Who was driving the car when you left her apartment?
Mundy: Michael.
East: Michael, where were you sitting at?
Mundy: In the back seat.
East: Who was back there with you?
Mundy: The other guy.
East: Which guy?
Mundy: Norris.
East: Norris. Did you all drive straight to the motel? Huh? What did you all do, did you all stop somewhere else, ride around, or what?
Kizer: We know part of what your [sic] telling us is not what they've all ready told us,
Kizer: So start from the beginning, when you all got on Dickens Place, what happened, who was in the car, who went inside the motel?
East: After you all parked the car, and started walking towards the motel,
Mundy: Just he told me,
East: Huh?
Mundy: (inaudible).
East: Well, I'm trying to,
Kizer: Trying to get your side.
East: Right, I'm trying to give you the opportunity to tell your side of it, thats all, isn't that fair?
Kizer: Their side of it is, that you were the trigger puller,
East: Is that the same thing?
Kizer: Is that the same thing? Well, then why don't you tell your side of it? What you just said is, you agree with what they said, that you pulled the trigger?
Mundy: No, I didn't.
Kizer: Why don't you tell us your side of it?

Mundy: And that was it, they went in the room there, they came out,

Kizer: When you went in, who was inside, just the clerk that time?

Mundy: Yeah.

East: What happened?

Kizer: Did you ask him for, for coffee?

Mundy: We went in there and,

Kizer: You asked him for coffee, said he didn't have any coffee, then you went out, did you do that?

Mundy: No, I ain't do that, I just seen him around the counter, I ain't do nothing like that.

Kizer: Who drew on him?

Mundy: Both of them.

Kizer: Keith and Michael?

East: Where was Norris at?

Mundy: He was outside.

Kizer: Outside?

Mundy: Yeah, he was outside.

East: Outside the motel, by the car, where?

Mundy: By the car.

Kizer: At what point and time did you get the safe and take it out?

Mundy: (inaudible).

Kizer: Huh? (inaudible)

Mundy: I don't know.

Kizer: What did you jump on top of the bowling alley for?

Mundy: Huh?

Kizer: Why did you hide on top of the bowling alley?

Mundy: (inaudible) that what I was shooting at, we heard some shots and thought someone was shotting [sic] at us.

East: Huh?

Kizer: Is that so, who did the shooting?

Mundy: I don't know.

East: You might be wrong about a month's salary, that I'm gonna put a gun in you [sic] hand.

Mundy: Put a gun in my hand, I didn't shoot,

East: We're gonna see.

Kizer: Your gun was a .44 or a .45? .45, you took it in, where did you have it at, you just admitted.

Mundy: .45, no.
Kizer:
Mundy: He said I'll bet you a day's salary.
Kizer: You said you had a gun, we've recovered a .45, you had to have took the gun inside.
Mundy: Take fingerprints then.
East: Okay.
Kizer: Don't you admit that you took the gun inside?
Mundy: No.
Kizer: You didn't?
Mundy: No.
Kizer: The others said that you did, their [sic] lieying [sic].
Mundy: Like I said, can't you tell their lieing [sic].
Kizer: Answer my questions, they said you did, are they lieing [sic]?
Mundy: Right, take fingerprints, and you'll know their lie-ing.
Kizer: Tell us who had the guns then?
Mundy: I don't know.
Kizer: How many guns did you need?
East: When you got up on the roof?
Mundy: They was shotting [sic] then.
East: Who was shotting [sic]?
Mundy: I don't know.
East: Uh-huh, did you hear some gunshots?
Mundy: Uh-huh.
East: You did? Where were you at when you heard those?
Mundy: I was outside.
East: Outside where?
Mundy: Outside the car.
East: Uh-huh, who was out there with you?
Mundy: I was by myself, then Mike he come out there,
Kizer: We're talking about the police officer who says you all run out the front door, you were outside?
Mundy: I don't know if he seen me or not, but I know he didn't see me.
Kizer: Saw three of them come out. The police were right on top of you, why do you think they were so quick in catching you, why do you think the dog was right there, caught you, hiding on the rooftop?

Mundy: Why, cause they was right there.

Kizer: They saw you, the police was right behind you all's car, you came out from nowhere, saw you all running out of the front door, all three of you.

Mundy: (inaudible).

Kizer: We recovered the safe, we recovered your own and the two other guns, they're all hanging it on you.

East: You know, your [sic] known for being a Mr. Tough Guy, that what your know [sic] for being. Mr. Tough Guy, in the city the city guys say your [sic] Mr. Tough Guy, I understand you've got a little come back time, you got caught for the concealed weapon, you were begging Richard Dunn to help you out, to keep you from going back in,

East: So you mean, your [sic] gonna take a fall like this,

Mundy: I didn't beg him from keeping me from going in,

East: What did you call, you called him?

Mundy: I talked to him, but I didn't call him to beg him to keep me out.

East: Well, that's what he tells me.

Mundy: (inaudible).

East: Uh-huh, so don't bother, your [sic] gonna get your come back time.

Mundy: I did my time.

East: Yeah.

Mundy: I did my time.

East: You've got some come back time, you've got some suspended time right?

Mundy: Yeah, what we got.

East: Okay, when you got busted for concealed weapon, you haven't been to court on that yet, have you?

Mundy: Yup.

East: You have, what happened?

Mundy: They dismissed it.

East: They did. Give you the gun back?

Mundy: Uh-huh.

East: What kind of gun was that?

Mundy: A shotgun.

East: Shotgun, sawed off shotgun, won't it?

Mundy: (inaudible).

Kizer: What your [sic] looking at now is death in the electric chair?

Mundy: But I didn't kill nobody.
Kizer: You've been caught red handed.
Mundy: But I didn't kill nobody.
Kizer: Did they shoot themselves?
Mundy: No, but I know I didn't shoot anybody.
Kizer: Who shot them?
Mundy: It won't me, like I said, I ran out when I heard the shots.
Kizer: I just told you, a policeman was standing right outside there in the hallway, and saw all three of you run out the front door.
Mundy: That's what he said
Kizer: That's exactly right.
East: That's what we'll say in court, tell the jury too.
Kizer: Do you think they're gonna believe you?
Mundy: How did he see me if he was outside?
Kizer: You had all ready taken it out and went back in, that's how it got out there.
Mundy: No, I took it out, was going back in,
Kizer: I don't believe you, cause we know your [sic] lieing [sic].
Mundy: That ain't no lie.
Kizer: You also just told me you didn't have a gun, and that's a lie.
Mundy: I didn't have a gun.
Kizer: Your lieing [sic].
Mundy: Like I said, you all had the guns,
Kizer: Yeah.
Mundy: Okay, then,
Kizer: That's what I'm telling you, we're trying to do you a favor Marvin,
Mundy: I understand what your [sic] talking about too, if you all ready have the gun,
Kizer: We've go em and we're do ah, but it's gonna take a little while to get that stuff back, what I'm telling you is, what you ought to be thinking about, thinking about, long and hard, because it's your life, cause it's gonna determine your life, this is the only opportunity we will give you to tell your side of what happened, and right now, your [sic] just saying, you don't know, you were outside, but we know you were outside, know you went in, we

know you went in with a gun, whether you used the gun, we know you ran out with guns, so do you want to tell us who actually fired the gun, and don't be telling us that you were outside when the shotting [sic] happened, do you want to talk anymore?

East: All of you gonna be around at 6:25 in the morning.

Kizer: It's up to you?

Mundy: I don't know what to say.

Kizer: (inaudible).

East: You know Timothy Clark? You did?

Wade: You know how he was murdered?

Mundy: (inaudible).

Wade: Okay, that's what we're talking about, no parole, life, life, get out when your 75, 75 or 90, go to the penitentiary, or death, or the electric chair, tell us your side of it?

Mundy: I'm already dead.

Wade: You told us you were outside.

Mundy: I said I was already dead.

Wade: (inaudible). Your [sic] already dead?

East: Somebody looking for you? Who? Who does?

Mundy: The police got a contract out on me.

East: The police did, who was supposed to be carrying it out?

Wade: Why do you think the police have a contract on you?

Mundy: I don't know.

East: Do you know this person?

Mundy: Yeah, I go over the house and go with em,

East: Go with what?

Mundy: (inaudible).

East: How about him?

Mundy: He goes, (inaudible). Police department.

East: The city police, huh, interesting.

Wade: Let's go through it one more time and you tell us what happened, okay? At what point did you get out of the car, when you all pulled up there?

Mundy: Got out of the car.

Wade: Who went inside?

Mundy: Ah, us three.

Wade: You, Keith and Michael?

Mundy: Uh-huh.
Wade: Norris waited outside, or did he come in and then leave?
Mundy: Came and left.
Wade: Norris came and then left, all right, after you got in, what happened?
Mundy: Huh?
Wade: After you got inside the office, tell us what happened?
Mundy: (inaudible).
Wade: Tell us how the robbery went down?
Mundy: Well, ah, just ah, just went in, ah, asked the man for some coffee.
Wade: He said they didn't have any coffee?
Mundy: That we wanted some coffee.
Wade: What did he say to that, did he say anything?
Mundy: He said that's it for employee's only.
Wade: Then what happened?
Mundy: (inaudible).
Wade: Michael and Keith did it, huh?
Mundy: Yeah.
Wade: You don't know whether you heard anyone shooting?
Mundy: No.
Wade: Then what happened? When they went back, did you know what they were gonna do, they ran back there, and you ran back to the car?
East: Who cut the phone line?
Mundy: I don't know, I carried the safe.
East: What was Michael and Keith doing?
Mundy: They were holding the man down.
Wade: Is this the safe where the cash was or was the cash in a separate drawer?
Mundy: I didn't see no cash.
Wade: Didn't ya'll ask the man to open the safe or the cash drawer?
Mundy: I wasn't there.
Wade: Did he open anything?
Mundy: (inaudible).
East: How did you know where the safe was?
Mundy: I see it.

East: You saw it? You knew where it was because that's where ah, Calvin use to
East: work at?
Mundy: Who?
East: Isn't that where Judson used to work at?
Mundy: Calvin?
East: Judson Calvin, Ned?
Mundy: Ned?
East: Uh-huh, didn't he used to work there?
Mundy: Did he?
East: I don't know.
Wade: What did you get out of the safe?
Mundy: I didn't see nothing cause,
Wade: Weren't you all open up on the rooftop?
Mundy: Some pennies or something.
Wade: What kind of a gun did Keith have?
Mundy: I didn't see it, I know he had a gun, but I didn't see what kind.
East: Was it a revolver or automatic?
Mundy: I think it was an automatic. I'm trying to think, I ain't sure, if I could see it, (inaudible).
Wade: Who had the .22, did you?
Mundy: Keith had it.
Wade: Keith did? Who had the silver coated gun?
Mundy: Keith.
Wade: Huh?
Mundy: Norris had a .22.
Wade: Who had the silver gun?
Mundy: Huh?
Wade: Who had the silver colored gun?
Mundy: (inaudible) cause I know, I left them,
East: What did you do with the safe?
Mundy: I set it down.
East: Set it down where?
Mundy: Outside, set it out.
East: On the sidewalk, beside the building?
Mundy: Yeah.
Wade: Take anything out of it?
Mundy: No.
East: Did you take the envelopes out of it then?
Mundy: Out of where, out of the safe?
East: Yeah?

Mundy: No, couldn't get into it.

East: Couldn't get into it?

Wade: Who threw the keys in the back?

East: The keys to the hotel?

Mundy: I didn't see no keys.

East: They were up on the roof.

Mundy: Oh, yeah, I did.

East: Did you use them for anything, just took them? Was the door locked or unlocked, when you all went in, did he have to let you all in, or did you all walk in the door?

Mundy: We went in.

East: The door was unlocked? When did you see the other man come in? Where were you at when he came in?

Mundy: Who?

East: The other man, the other white man?

Mundy: Over here, by the, on this side right there.

East: On what side, the side nearest Broad St., or the side nearest where the car was parked?

Mundy: Toward Broad St.

East: Did you see him get out of the car or anything?

Mundy: Yeah, I seen a car pull up, but, you know, I don't never see,

East: Know what kind of car it was, what color it was?

Mundy: (inaudible).

East: Where did he park it at?

Mundy: He parked it out front.

East: Near where you were at or on the other side, or where?

Mundy: Other side.

East: Other side, did you see him get out? Well, how did you know it was a white man?

Mundy: I could see he was white.

East: Well, I asked you when the other white man came in?

Mundy: You asked me when another man came in.

East: Yeah.

Mundy: You didn't say white.

East: Yeah, I did say white.

Mundy: I know I seen the car, (inaudible).

Wade: Is it true that you shot both of them?

Mundy: Me, no, I didn't shoot nobody.

Wade: Where was your gun?

Mundy: I didn't even have my gun.

East: We've got a witness that says he put the gun in your hand, as you were running?

Mundy: Not in my hand. Not in my hand.

East: Unless you were wearing gloves?

Mundy: I didn't have gloves on, when you locked me up.

East: Well, you had plenty of time to get rid of them, see, must have, cause that why your [sic] playing a little fingerprints game with us, you know, you can find and check the fingerprints, all this stuff, that's why your [sic] playing a little game.

Mundy: Ask him why he didn't find the gloves then, didn't find any gloves?

East: We're still looking, okay.

Wade: A witness say you come out.

Mundy: Well, you get him in her and tell me.

Wade: You want him to tell you?

Mundy: Yeah, cause I don't believe you? I want to see for myself.

Wade: He didn't say he saw you shooting Marvin, he saw you run out the doors, with the other two.

Mundy: I didn't say I did, I'm telling you, when I seen the car pull up, that when I started running.

Wade: Yeah and that's was the same time that, all three of you came out the same time, and two had been shot by then.

Mundy: I won't there, I won't in no motel.

East: All three of you all were inside the motel. He watched you come out the front door.

Mundy: All three of us weren't in the hotel at the same time, when he said he seen somebody,

Wade: Okay, you tell us you didn't do the shooting, you heard the shots though?

Mundy: Yeah.

Wade: And where were you when you heard the shots?

Mundy: Right there, I was coming out,

Wade: Coming out the front door?

Mundy: Yeah.

Wade: Okay, who was inside?

Mundy: Wasn't anybody, but Keith and Mike in there?

East: One of them had a .22, another one had a what, a .38, .357, shotgun, rifle, what?

Mundy: I don't know what they had, I don't exactly know what they had.

Wade: You said one of them had the .22 and the other one had another gun, okay so neither one of them had your gun?

Mundy: My gun was in the trunk.

Wade: Yes, that's right, so if you didn't have the .22, the other one had another gun, not your gun, your gun was in the trunk,

Mundy: See, I didn't know,

Wade: You fired?

Mundy: How I gonna fire a gun, can you answer this question, how can I fire a gun, this and all that?

Wade: Cause, you left and went out, took the safe out, and went back,

East: You took your gun out of the car and you took it out of the pouch you carried it around in, and you threw the pouch in the trunk.

Mundy: (inaudible).

East: Did not stop you from getting arrested before, you said, you've been arrested before, you said, you know about concealed weapons, you must not have known too much about it, if you got arrested or it.

Mundy: No, only this is, cause like I told you, (inaudible).

East: Uh-huh.