COURT OF APPEALS OF VIRGINIA


Present:   Chief Judge Felton, Judges Elder, Frank, Humphreys, Clements, Kelsey, McClanahan,
           Haley, Petty, Beales and Millette
Argued at Richmond, Virginia


MICHAEL RAY FERGUSON, JR.
                                                            OPINION BY
v.       Record No. 0748-06-3                        JUDGE ROBERT P. FRANK
                                                            JULY 22, 2008
COMMONWEALTH OF VIRGINIA


UPON A REHEARING EN BANC

FROM THE CIRCUIT COURT OF PITTSYLVANIA COUNTY
Charles J. Strauss, Judge

Glenn L. Berger (Berger & Thornhill, on brief), for appellant.

Josephine F. Whalen, Assistant Attorney General II (Robert F.
McDonnell, Attorney General, on brief), for appellee.


        Michael Ray Ferguson, Jr., appellant, was convicted of burglary, in violation of Code

§ 18.2-91, and grand larceny, in violation of Code § 18.2-95.[1] On appeal, appellant contends that

_____

        [1] Appellant noted an appeal to the revocation of his suspended sentence. However, he
never challenged this revocation before the panel considering the merits of his appeal, and, thus,
the panel's opinion did not address the issue.
        In his brief on rehearing *en banc*, appellant argued that "[t]he revocation of [appellant's]
suspended sentence was based solely on his convictions for breaking and entering and grand
larceny. A reversal of these convictions removes the basis for the revocation and the revocation
should therefore be reversed." Appellant does not provide any argument or reasoning for this
conclusion, and he cites no authority for his proposition.
        A reversal of an underlying conviction does not necessarily require the reversal of the
revocation of a suspended sentence that flows from that conviction. Resio v. Commonwealth, 29
Va. App. 616, 621-22, 513 S.E.2d 892, 895 (1999) (holding that the suspension of a suspended
sentence can be revoked based on "substantial misconduct," that such revocation does not hinge
on the "conviction" of a criminal offense based on that misconduct, and that the pendency of a
conviction on appeal does not necessarily impact the trial court's decision to revoke a suspended
sentence).
        It is clear from the record that the trial court considered the conduct underlying the
conviction in revoking appellant's suspended sentence. At the time appellant pled guilty to
burglary and grand larceny, the Commonwealth recited the factual details of those offenses to the
trial court. Appellant agreed with the Commonwealth's recitation. Thus, the trial court heard

the trial court erred in denying his motion to suppress statements he made to police officers. Appellant argues that these statements were taken in violation of his Fifth Amendment right to counsel. A panel majority of this Court found that the trial court erred in denying appellant's motion to suppress, and reversed appellant's convictions. We granted a petition for rehearing *en banc* at the request of the Commonwealth, and stayed the mandate of the panel decision. Upon rehearing *en banc*, we reverse appellant's convictions for burglary and grand larceny.

BACKGROUND

On July 28, 2005, police officers stopped appellant's vehicle in the town of Altavista, which is located in Campbell County. These officers detained appellant in his vehicle until police officers from the neighboring jurisdiction responded to the scene, since appellant's vehicle matched the description of a vehicle involved in a breaking and entering of a home in Pittsylvania County.

When Investigator Hagerman of the Pittsylvania County Sheriff's Department arrived on scene, he asked appellant to go with the officers to the police department in the Town of Hurt in Pittsylvania County to "talk." This police department was located approximately one-half of a mile from where appellant's vehicle was stopped. Appellant drove his vehicle to the police department, followed by five police officers in their police vehicles. Three of those police officers, including Investigator Hagerman, accompanied appellant into the police department.[2]

The interview began at 1:25 p.m. Investigator Hagerman told appellant that they were interviewing him "in reference to a B & E that occurred at the Mark Worley residence" the previous

---

evidence of "substantial misconduct," independent of the criminal convictions, on which to base its revocation of appellant's suspended sentence. Indeed, the trial court noted in the revocation order that it had made its decision based on the "evidence adduced in open court in the presence of [appellant]." As appellant presents no argument as to why we should depart from our reasoning in Resio, we find that the evidence of substantial misconduct was sufficient, independent of the criminal convictions, to revoke appellant's suspended sentence.

[2] The Hurt Police Department is located in the town hall building, and the interview with appellant occurred in the chamber of the town council.

day.[3] Investigator Hagerman then asked appellant for permission to search his vehicle. Appellant responded, "Nah, I want a lawyer, you know what I'm saying?" Investigator Hagerman replied, "Okay. But anyway . . . ." Investigator Hagerman then read appellant his Miranda rights, and asked appellant to sign a document acknowledging that he had been read his Miranda rights.

Investigator Hagerman continued the conversation with appellant:

> Hagerman: Michael, I'll just tell you what the offense was that we were talking about uh, do you want to go ahead and talk with me?
>
> [Appellant]: Uh, my moma [sic] said that if I get in any more trouble I need a lawyer.
>
> Hagerman: Okay, well, you don't have to talk to me. Let me talk to you now.

Investigator Hagerman did not ask appellant any questions regarding his request for counsel, but instead proceeded to talk to appellant about the instant offenses.

> Hagerman: I've got positive identification of your car as it was pulling out of that house yesterday. Uh, there was about four thousand dollars worth of items stolen. Now, if you're willing to talk. If you want to go ahead and talk to me about this fine, if you don't, you know you're in trouble right now. Uh, I'm not, I'm not playing with you. I'm not, I'm –
>
> [Appellant]: I understand.
>
> Hagerman: [Unintelligible] straight out. Uh, the only hope you've got right now is to come clean as you can get. Let me try to get this stuff back that was stolen, that was taken, and uh, if, you know, you're on probation, I mean you need to think for yourself, you're twenty years old. [Unintelligible] saw the vehicle come down the hill right behind your car when you was [sic] pulling out spinning wheels.
>
> [Appellant]: I don't nothing [sic] about that.

---

[3] The conversation between appellant and the police officers was recorded, and a transcript of that recording was entered into evidence at the hearing on the motion to suppress.

> Hagerman:      Okay. Where was [sic] you at yesterday?
>
> [Appellant]:    I was with my daddy up at the house.

Investigator Hagerman then obtained from appellant his address, his father's name, and whether any of his friends were with him the day before. Investigator Hagerman questioned appellant's alibi, saying, "[Y]ou think your daddy is going to say that you were home all day yesterday?" He also asked appellant about his employment status and how he got his money.

At that point, Investigator Hagerman told appellant that he was going to let him "sit here for a few minutes" and that "this concludes the interview." Investigator Hagerman then turned off the tape recorder, and told appellant that if he returned to Pittsylvania County in the future, Investigator Hagerman would put him in jail. Investigator Hagerman left the room with Deputy C.W. Glass, asking Chief Brian Marr of the Hurt Police Department to stay in the room with appellant. Chief Marr knew appellant, through appellant's mother, prior to his interaction with him that day.

For twenty minutes, Chief Marr and appellant sat in silence in the room. Appellant then stated either "I messed up" or "This is messed up."[4] Chief Marr testified that they then began to discuss appellant's family and his job status, and Chief Marr told appellant that "he needed to help his [sic] self." About 10 minutes of discussion occurred between appellant and Chief Marr before Chief Marr asked Investigator Hagerman to return to the room. At that time, Chief Marr began recording the second part of the interview.

The transcript of the second part of the interview indicates a portion of what appellant and Chief Marr discussed before the tape began recording. At one point, Chief Marr stated, "I've adivsed [sic] you that you can help yourself, okay." Later in the statement, Chief Marr acknowledged part of the earlier, unrecorded conversation, "[J]ust like I've told you before, we

---

[4] Chief Marr testified that he did not know exactly what appellant said that broke the silence, and appellant testified at the suppression hearing that appellant had said that he "[didn't] want to go to jail."

know more than what you're telling us. . . . Help yourself out. You come [sic] this far man. You want me to help you and you want the investigator to help you." Chief Marr also alluded to promises made by himself and Investigator Hagerman that were not recorded, saying "The man [Investigator Hagerman] has already given you his word to help you. I've give [sic] you my word to help you."

Chief Marr read appellant his <u>Miranda</u> rights again, and "asked him would he speak with [Chief Marr] rather than Investigator Hagerman, would he feel more comfortable with that." Appellant indicated that he would. Appellant gave a statement regarding the offenses at approximately 2:00 p.m.

After making these statements, appellant was arrested.

The trial court determined that appellant made a clear and unambiguous request for counsel, and suppressed any statements made to Investigator Hagerman before he left the room. However, the trial court found that appellant "reinitiated the conversation" and "broke the silence." The trial court denied appellant's motion to suppress his statements made to Chief Marr. Appellant then entered a conditional plea of guilty pursuant to Code § 19.2-254, preserving for appeal the alleged violation of his Fifth Amendment right to counsel.

This appeal follows.

ANALYSIS

Appellant contends that, after he "clearly asserted his right to counsel," police officers engaged in "coercive tactics," failed to provide counsel, and continued to interrogate him, in violation of the Fifth Amendment.[5] Appellant argues that, as a result, any statements he made must be suppressed.

---

[5] Appellant, in his question presented, also argued that his statements were taken in violation of his Sixth Amendment right to counsel. However, appellant did not make any argument, nor did he cite to any authority, in support of his contention. As such, we do not

On appeal from a trial court's ruling on a motion to suppress, the appellant must show that the trial court's decision constituted reversible error. See Stanley v. Commonwealth, 16 Va. App. 873, 874, 433 S.E.2d 512, 513 (1993). We view the evidence in the light most favorable to the prevailing party, granting to it all reasonable inferences fairly deducible therefrom. See Commonwealth v. Grimstead, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991). We review the trial court's findings of historical fact only for clear error. See Shears v. Commonwealth, 23 Va. App. 394, 398, 477 S.E.2d 309, 311 (1996). However, we review *de novo* the trial court's application of defined legal standards to the particular facts of a case. Ornelas v. United States, 517 U.S. 690, 697 (1996).

The Fifth Amendment Right to Counsel

"The right of a criminal suspect to have an attorney present during custodial interrogation was first articulated by the Supreme Court in Miranda v. Arizona, 384 U.S. 436, 469-73 (1966)." Commonwealth v. Hilliard, 270 Va. 42, 49, 613 S.E.2d 579, 584 (2005). The Court in Miranda "held that before interrogating a suspect who is in police custody, law enforcement officers must inform the suspect of certain rights, including the right to the presence and assistance of counsel." Id. "Miranda conditioned the admissibility at trial of any custodial confession on warning a suspect of his rights: failure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained." Missouri v. Seibert, 542 U.S. 600, 608 (2004).

In Edwards v. Arizona, 451 U.S. 477 (1981), the Court "established a second layer of prophylaxis for the Miranda right to counsel[,]" McNeil v. Wisconsin, 501 U.S. 171, 176 (1991), holding that, "an accused, . . . having expressed his desire to deal with the police only through

---

consider this issue on appeal. Rule 5A:20(c); Buchanan v. Buchanan, 14 Va. App. 53, 56, 415 S.E.2d 237, 239 (1992) ("Statements unsupported by argument, authority, or citations to the record do not merit appellate consideration.").

counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards, 451 U.S. at 484-85.

> Thus, the prophylactic protections that the Miranda warnings provide to counteract the "inherently compelling pressures" of custodial interrogation and to "permit a full opportunity to exercise the privilege against self[-]incrimination," are implemented by the application of the Edwards corollary that if a suspect believes that he is not capable of undergoing such questioning without advice of counsel, then it is presumed that any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the "inherently compelling pressures" and not the purely voluntary choice of the suspect.

Arizona v. Roberson, 486 U.S. 675, 681 (1988) (quoting Miranda, 384 U.S. at 467).

Only if the accused initiates further "communication, exchanges, or conversations with the police," and only if those communications result in the accused changing his or her mind and freely and voluntarily waiving the right to counsel, may the police resume interrogation without violating the Edwards rule. Roberson, 486 U.S. at 682.

In evaluating the admissibility of a statement under the Edwards rule, we apply a three-part analysis. First, the trial court must determine whether the accused

> "unequivocally" invoked his or her right to counsel. Second, the trial court must determine whether the accused, rather than the authorities, initiated further discussions or meetings with the police. Third, if the accused did initiate further discussions or conversations with police, the trial court must then ascertain whether the accused knowingly and intelligently waived the previously invoked right to counsel.

Giles v. Commonwealth, 28 Va. App. 527, 532, 507 S.E.2d 102, 105 (1998).

> Once an accused asserts his or her right to counsel, subsequent waiver of that right is not sufficient to make admissible any incriminating statements thereafter obtained, even if investigators have re-Mirandized the accused, unless the statements are initiated by the defendant and shown to be based on a knowing, intelligent, and voluntary waiver.

Id. at 531, 507 S.E.2d at 105.

<u>Request for Counsel</u>

We must consider the first prong of the <u>Edwards</u> analysis: whether appellant made an unequivocal request for counsel.[6]

The Commonwealth contends that appellant's first request for counsel "related solely to the issue of consent to search" and that appellant's second request for counsel "was merely a restatement of his mother's advice." The Commonwealth argues that neither "comment" would have been "understood by a reasonable police officer under the circumstances to be a request to have counsel present during the interrogation." We disagree.

"[W]hether an accused 'clearly requested an attorney during a custodial interrogation is a mixed question of law and fact.'" <u>Medley v. Commonwealth</u>, 44 Va. App. 19, 30, 602 S.E.2d 411, 416 (2004) (*en banc*) (quoting <u>Commonwealth v. Redmond</u>, 264 Va. 321, 326, 568 S.E.2d 695, 697 (2002) (plurality opinion)). "'The determination of what [the accused] actually said is a question of fact that we review only for clear error. . . . Whether those words are sufficient to invoke the right to counsel is a legal determination that we review *de novo*.'" <u>Id.</u> (quoting <u>Redmond</u>, 264 Va. at 327, 568 S.E.2d at 698).

"[The Supreme] Court has consistently held that a clear and unambiguous assertion of the right to counsel is necessary to invoke the <u>Edwards</u> rule." <u>Midkiff v. Commonwealth</u>, 250 Va. 262, 266, 462 S.E.2d 112, 115 (1995). "[A] suspect must state his desire to have counsel present with sufficient clarity that a reasonable police officer under the circumstances would understand the statement to be a request for counsel." <u>Hilliard</u>, 270 Va. at 49, 613 S.E.2d at 584 (citing <u>Davis v. United States</u>, 512 U.S. 452, 459 (1994)). If, however, a suspect's reference to an attorney is either ambiguous or equivocal, such that a reasonable officer under the circumstances

---

[6] The trial court found that appellant's first request for counsel was clear and unequivocal and that, while "his second statement [was] not clear," it "tend[ed] to support his first statement that he wants a lawyer at that point."

would only have understood that the suspect *might* be invoking his right to counsel, the officer is not required to stop questioning the suspect. Davis, 512 U.S. at 459, 461; Redmond, 264 Va. at 328-29, 568 S.E.2d at 699.

At the outset of the interview, Investigator Hagerman asked appellant for consent to search his vehicle. Appellant responded, "Nah, I want a lawyer, you know what I'm saying?" In context, appellant clearly wanted an attorney before he was interrogated. Police officers told appellant he was being interviewed in connection with a breaking and entering. Further, nothing in appellant's first statement indicated that he wanted a lawyer only if the police were going to search his vehicle. Appellant denied consent to search his vehicle, and then he stated his request to have counsel present.

We find appellant's first request for counsel clear and unambiguous.[7] We hold that a reasonable officer under the circumstances would understand that appellant was invoking his right to counsel.

### Initiation of Discussion After Request for Counsel

As appellant asserted his right to counsel, we then turn to the second prong of the Edwards analysis: whether police officers or appellant initiated further discussions after appellant invoked his right to counsel.

The Supreme Court in Miranda and Edwards made clear that "'[i]f the individual states that he wants an attorney, the interrogation *must cease* until an attorney is present.'" Commonwealth v. Gregory, 263 Va. 134, 146, 557 S.E.2d 715, 722 (2002) (quoting Miranda, 384 U.S. at 474). "The Edwards rule provides a 'relatively rigid requirement' that police and prosecutors must observe." Hines v. Commonwealth, 19 Va. App. 218, 221, 450 S.E.2d 403,

---

[7] Because we find appellant's first request sufficient to invoke his right to counsel, we need not consider whether his second statement referring to an attorney was clear and unequivocal.

- 9 -

404 (1994) (quoting Fare v. Michael C., 442 U.S. 707, 718 (1979)). "[T]he rigid rule [was fashioned to announce] that an accused's request for an attorney is *per se* an invocation of his Fifth Amendment rights, requiring that all interrogation cease." Michael C., 442 U.S. at 719; see also Gregory, 263 Va. at 147, 557 S.E.2d at 722 ("The prophylaxis of Miranda and Edwards provides the right to have counsel present during interrogation as an additional safeguard in the exercise of the right against self-incrimination."). Thus, the rule in "Edwards focuses on the state of mind of the suspect and not of the police." Roberson, 486 U.S. at 687.

The facts in the instant case are markedly similar to those in Hines, 19 Va. App. 218, 450 S.E.2d 403. There, detectives from two different jurisdictions were present in the interview room with Hines in order to question him about separate criminal offenses that had occurred in their respective cities. Id. at 220, 450 S.E.2d at 403. The Hampton detective read Hines his Miranda rights, and then began questioning him about a criminal offense in Hampton. Id. Hines became aggravated and stated that he wanted to return to his jail cell and to speak to his attorney. Id. In response, the Hampton detective said, "'All I wanted to know is whether you're going to be a witness or a defendant in the matter.'" Id. Hines asked the detective what he meant by "witness," and the discussion between the two continued. Id. Hines made inculpatory statements regarding the Hampton offenses. Id. A Newport News detective was present in the room for this entire exchange. Id.

When the Hampton detective concluded his interview, he exited the room, leaving Hines with the Newport News detective. Id. The Newport News detective then asked Hines if he understood his Miranda rights, and Hines stated that he did. Id. Hines then made incriminating statements regarding the Newport News offenses, and these statements and offenses were the subject of the appeal. Id. at 220, 450 S.E.2d at 403-04.

After finding that Hines made a "specific and unambiguous request to consult with his lawyer," this Court analyzed the conversation that occurred after his request under the second prong of Edwards. This Court held that

> [b]y asking Hines "whether [he was] going to be a witness or a defendant in the matter," the officer continued the conversation that he was bound to cease. This inquiry was a reinitiation of the dialogue that Hines sought to terminate. . . . Thus, the ensuing "communication, exchanges, or conversation with the police," Edwards, 451 U.S. at 485, was initiated by the police officer's further inquiry to Hines.

Hines, 19 Va. App. at 221, 450 S.E.2d at 404 (second alteration in original).

In Hines, this Court did not evaluate whether the defendant "reinitiated" the conversation with police by asking what the officer meant by "witness," nor did we parse out the conversations between the two different detectives. Instead, this Court found that, "[w]hen the officer continued the dialogue without first giving Hines access to his lawyer, the statements that he elicited did not follow upon a valid waiver of Hines's Fifth Amendment rights." Id. at 222, 450 S.E.2d at 405. We ruled that Hines's statement to the Newport News detective should have been suppressed on those grounds. Id.

Any consideration of whether a defendant "re-initiated" the dialogue with police necessarily presumes that police officers have stopped the interrogation upon a defendant's request for counsel. Indeed, the analysis under Edwards presupposes that police will cease all interrogation after a suspect invokes his right to counsel. When police do not cease interrogation, their statements constitute an "initiation" of further discussions with a suspect, and any incriminating statements gained during that discussion are deemed inadmissible. Hines, 19 Va. App. at 221, 450 S.E.2d at 404.

Here, as in Hines, despite appellant's invocation of his right to counsel, the interview never ceased. Investigator Hagerman and Chief Marr continued questioning appellant as if his

- 11 -

request for counsel had never been made. Investigator Hagerman ignored appellant's initial request, saying, "Okay. But, anyway . . . ." When appellant made a second statement referencing an attorney, Investigator Hagerman acknowledged that appellant sought to terminate the interview, saying, "Okay, well, you don't have to talk to me. Let me talk to you now." Chief Marr was present during this entire exchange, and was aware that appellant had invoked his right to counsel. In response to Investigator Hagerman's subsequent questions, appellant denied any involvement in the crime, provided an alibi for his whereabouts, and furnished an explanation for how he had money when he did not hold any gainful employment.

Investigator Hagerman's continued inquiry was interrogation. "[T]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980) (footnote omitted). The "Innis standard" thus presents a question of law, "requiring a determination whether an objective observer would view an officer's words or actions as designed to elicit an incriminating response." Blain v. Commonwealth, 7 Va. App. 10, 15, 371 S.E.2d 838, 841 (1988).

Investigator Hagerman's questions were clearly "designed to elicit an incriminating response." Investigator Hagerman told appellant that a witness could place his vehicle at the crime scene at the time of the crime, and then advised appellant that "the only hope" he had was to "come clean as you can get." Investigator Hagerman told appellant that someone had identified his car leaving the crime scene. Investigator Hagerman said that if appellant did not want to talk to him "about this," that appellant knew that he was "in trouble right now." Investigator Hagerman stated that appellant's "only hope" was to confess, and mentioned

appellant's probationer status.  Investigator Hagerman questioned whether appellant's alibi would hold up, and inquired as to how he had any money when he was not working at the time.[8]

Then, as in Hines, Investigator Hagerman left appellant in the company of Chief Marr, who knew appellant prior to their interaction that day.  Chief Marr was present during the entire exchange between Investigator Hagerman and appellant, and had heard appellant's request for counsel.  Appellant had the opportunity to consider Investigator Hagerman's statements while he sat in silence for twenty minutes with Chief Marr.

This period of silence did not suffice as a "break" in the interrogation sufficient to render appellant's later statements admissible.  In Seibert, 542 U.S. 600,[9] the United States Supreme Court found that a twenty-minute break in questioning of the suspect did not separate the interview into two independent interrogations, as "it would ordinarily be unrealistic to treat two spates of *integrated and proximately conducted questioning* as independent interrogations subject to independent evaluation simply because Miranda warnings formally punctuate them in

---

[8] It is of no consequence that appellant did not make any inculpatory statements during his first discussion with Investigator Hagerman.  As the Supreme Court of Virginia observed in Gregory, "it is not the fruits of the investigation that are at issue; rather, it is the coercive atmosphere of the custodial interrogation itself."  Gregory, 263 Va. at 147-48, 557 S.E.2d at 723 (holding that the Court of Appeals erred in utilizing a harmless error analysis as to the defendant's first interrogation where nothing inculpatory came from that interrogation).

[9] The dissent takes issue with our reliance on Seibert, 542 U.S. 600, noting that it is a "plurality opinion."  However, that it is a plurality opinion is relevant only if we are citing to Seibert for a proposition that is not endorsed by the majority of the Court.  As Justice Kennedy's concurring opinion noted, he agreed "with much in the careful and convincing opinion for the plurality," though he noted that his *approach* did "differ in some respects."  Seibert, 542 U.S. at 618 (Kennedy, J. concurring).  Justice Kennedy's divergence from the opinion of Justice Souter focused solely on whether a sort of "good faith" exception applied in the context of a two-stage interrogation.  Justice Kennedy did not take issue with Justice Souter's conclusion that the break in the interview did not suffice to transform the questioning into two discrete interrogations entitled to separate reviews.  Indeed, the very fact that Justice Kennedy concurred in the judgment reversing Seibert's conviction hinges on his agreement that the two-stage interrogation process in Seibert was a single course of conduct, despite the break in the interview, that violated the defendant's rights under Miranda.  That is the very proposition for which we cite to Seibert, and that is the very proposition with which five Justices of the United States Supreme Court agreed.

the middle." Seibert, 542 U.S. at 614 (emphasis added). Police officers questioned Seibert at a police station and engaged in an interrogation technique that intentionally withheld Miranda warnings during initial questioning. Id. at 605. Police then allowed Seibert to have a twenty-minute "coffee and cigarette break," though she remained in continuous police custody. Id. After this break, officers read Seibert her rights under Miranda, and elicited incriminating information by using statements she had made before she received the warnings. Id. The Court found that this break was not sufficient to turn the interview into two distinct interrogations. Id. at 614. The Court characterized this break as merely a "pause" in the interrogation, and held that the Miranda violation that occurred before the break served as grounds to exclude statements made after the break in questioning. Id. at 616-17.

The same rationale applies in the instant case. Investigator Hagerman purposefully exited the interview room, after ignoring appellant's requests for counsel and cajoling him into making statements, and left him in the company of Chief Marr, a friend of appellant's mother. After a conversation with Chief Marr about appellant's family and after Chief Marr and Investigator Hagerman promised to "help" appellant in the case, appellant waived his Miranda rights and made incriminating statements. This course of conduct, undertaken by both Investigator Hagerman and Chief Marr, was clearly tailored to "elicit an incriminating response from appellant," despite his repeated requests for counsel. As in Seibert, the Commonwealth cannot rely on a twenty-minute "pause" in the questioning to save the violation of appellant's right to counsel. Appellant's incriminating statements were the direct result of Investigator Hagerman's continued interrogation of appellant after he invoked his right to counsel and the ensuing period of silence in the custody of Chief Marr. "[I]f the accused has invoked his or her right to counsel and has remained in continuous custody, the statement is inadmissible unless the trial court finds that the statement was made at a meeting with the police that was initiated by the

defendant or attended by his lawyer." Quinn v. Commonwealth, 25 Va. App. 702, 712, 492 S.E.2d 470, 475 (1997); see also Seibert, 542 U.S. at 614.

By questioning appellant in this manner after he requested counsel, Investigator Hagerman and Chief Marr "continued the conversation that [they were] bound to cease." Hines, 19 Va. App. at 221, 450 S.E.2d at 404. "Once [appellant] invoked his right to confer with his counsel, 'a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.'" Id. (quoting Edwards, 451 U.S. at 484 (footnote omitted)).

> "If the police do subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards. This is 'designed to prevent police from badgering a defendant into waiving his previously asserted Miranda rights.'" McNeil, 501 U.S. at 177 [(quoting Michigan v. Harvey, 494 U.S. 344, 350 (1990)].

Gregory, 263 Va. at 148, 557 S.E.2d at 723.

At first glance, Mundy v. Commonwealth, 11 Va. App. 461, 390 S.E.2d 525, aff'd on reh'g en banc, 399 S.E.2d 29 (1990), and Correll v. Commonwealth, 232 Va. 454, 352 S.E.2d 352 (1987), appear to be factually analogous to the instant case. Both Correll and Mundy involve situations where, during the course of interrogation, a suspect requests counsel and police officers continue to question the suspect in complete disregard of this request. However, a closer reading of each case reveals legally significant distinctions between those cases and the one presently before this Court.

In Mundy, police officers were questioning Mundy at the police department about his involvement in a robbery and shooting. Mundy, 11 Va. App. at 467, 390 S.E.2d at 528. During the initial interrogation, officers advised Mundy of his Miranda rights and Mundy made two

- 15 -

requests for counsel. Id. Officers ignored these requests, and continued their interrogation without providing Mundy with an attorney. Id. at 468, 390 S.E.2d at 528. After making the first statement, where he confessed to participating in the robbery but denied any involvement in the shooting, Mundy was transferred to a different area of the building. Id. Three hours later, Mundy asked to speak with the officers again, and, after waiving his Miranda rights, Mundy made a second statement. Id. The next day, while in court, Mundy expressed his desire to talk to the Commonwealth's attorney. Id. After waiving his Miranda rights again, Mundy made his third statement. Id.

At the hearing on his motion to suppress his statements, Mundy argued only that he was coerced into making the three statements. Id. at 469, 390 S.E.2d at 529. As to the first statement, Mundy contended that officers denied him the use of the bathroom, resulting in his personal discomfort. Id. Additionally, Mundy maintained that the officers' refusal to provide him with an attorney at his request coerced him into making his first statement. Id. Further, Mundy argued that, because he had "let the cat out of the bag" in making the first statement, the coercion present in the first statement caused the second and third statements to be coerced. Id. The Commonwealth in Mundy conceded that the first statement was inadmissible, but denied that there was any coercion present when Mundy made any of the statements. Id.

Mundy framed his argument to the trial court, and on appeal, under the third prong of the Edwards analysis, namely whether his waivers of his Miranda rights were voluntary. Id. Mundy did not contend that police officers reinitiated interrogation in violation of Edwards; indeed, an argument based on the third prong of the Edwards analysis *presumes* that the defendant reinitiated the interrogation. Giles, 28 Va. App. at 532, 507 S.E.2d at 105 ("Third, *if the accused did initiate further discussions or conversations with police*, the trial court must then ascertain whether the accused knowingly and intelligently waived the previously invoked right to counsel." (emphasis

added)). In <u>Mundy</u>, this Court based its analysis solely on the arguments before the court,[10] and evaluated Mundy's statements under the third prong of <u>Edwards</u>. <u>Mundy</u>, 11 Va. App. at 470, 390 S.E.2d at 529 ("We, therefore, must decide whether the waivers of the <u>Miranda</u> rights obtained before the two statements were knowingly and intelligently given.").

In <u>Correll</u>, a Roanoke police officer questioned Correll following his arrest for robbery and murder. <u>Correll</u>, 232 Va. at 460, 352 S.E.2d at 355. During that questioning, Correll requested counsel, "but said he could not afford to hire a lawyer." <u>Id.</u> Correll did not consult with an attorney, "but discussions continued between Correll and the police." <u>Id.</u> Correll was questioned on the day of his arrest, as well as on the following day, but the statements Correll made on these days were not offered into evidence.[11] <u>Id.</u> On the third day, Correll took a polygraph test and was returned to the jail in Franklin County. <u>Id.</u> There, he told a Franklin County police officer that he wanted to talk to him and to explain the polygraph results; this officer was unaware that Correll had requested an attorney when he was incarcerated in Roanoke. <u>Id.</u> The Franklin County officer read Correll the warnings under <u>Miranda</u>, and Correll waived his rights. <u>Id.</u> Correll then confessed to the crimes. <u>Id.</u>

On appeal, Correll never alleged that his request for counsel on the first day of interrogation was linked to any subsequent violations of his Fifth Amendment rights. Instead, Correll argued that his conversation with the Franklin County officer on the third day was "an extension of the interrogation that began that morning . . . [with] a polygraph test." <u>Id.</u> at 463,

---

[10] In fact, the Court in <u>Mundy</u> could not consider whether the officers reinitiated the interrogation under the second prong of the <u>Edwards</u> analysis, as that argument was not presented to the trial court and was not before them on appeal. <u>See</u> <u>Belmer v. Commonwealth</u>, 36 Va. App. 448, 458, 553 S.E.2d 123, 128 (2001) ("'We do not address' issues that the parties failed to raise at trial and failed to present or develop on appeal." (quoting <u>Powell v. Commonwealth</u>, 36 Va. App. 231, 232, 548 S.E.2d 926, 927 (2001))); <u>see also</u> Rules 5A:18 and 5A:20.

[11] The opinion does not contain any information about the details of the conversation between Correll and Roanoke police officers during either of the first two interviews.

352 S.E.2d at 357.  However, the opinion contains no information about the circumstances surrounding Correll's polygraph test.[12]  Instead, the Court had only the testimony of the Franklin County police officer and Correll that indicated that Correll initiated the third interview.  Id. at 461, 352 S.E.2d at 356.  Based on the information before the Court on appeal, the Court held that Correll had initiated the third interview and proceeded to analyze whether Correll's waiver of his Miranda rights was knowing and voluntary.  Id. at 464, 352 S.E.2d at 357.

Here, as in Hines, Investigator Hagerman and Chief Marr violated appellant's Fifth Amendment rights by continuing to interrogate appellant after he invoked his right to counsel. See McDaniel v. Commonwealth, 30 Va. App. 602, 607, 518 S.E.2d 851, 854 (1999) (en banc) (reversing the trial court's denial of the defendant's suppression motion because "the detective gained [the defendant's] confession by continuing the interrogation after [the defendant] had invoked his Fifth Amendment right to counsel").  Since appellant was in the continuous custody of police officers from the time he first invoked his right to counsel until he made incriminating statements to Chief Marr, his confession to Chief Marr is presumed to be involuntary and is inadmissible at trial.  Gregory, 263 Va. at 148, 557 S.E.2d at 723.

We need not address whether appellant's statement to Chief Marr that broke the period of silence "reinitiated" a dialogue with police; Investigator Hagerman's and Chief Marr's continued interrogation of appellant after he invoked his right to counsel initiated the dialogue with appellant under the second prong of Edwards.  Hines, 19 Va. App. at 222, 450 S.E.2d at 405.

---

[12] The federal appellate court considering Correll's federal habeas claim noted that

> there is a complete dearth of information in the record concerning the circumstances surrounding Correll's decision to submit to the polygraph examination or any further information pertaining to the timing or events surrounding the disclosure of the results.  Correll simply failed to develop these facts during the state court proceedings.

Correll v. Thompson, 63 F.3d 1279, 1288 (4th Cir. 1995).

Because Investigator Hagerman and Chief Marr failed to cease questioning and interrogation of appellant after appellant made an unequivocal request for counsel, "the statements that he elicited did not follow upon a valid waiver of [appellant's] Fifth Amendment rights." Id. As such, we find that appellant's statements should have been suppressed.

CONCLUSION

We hold that appellant, while in police custody, made a clear and unequivocal request for counsel. Police officers did not cease their interrogation in honor of that request, violating appellant's Fifth Amendment rights. This violation tainted any subsequent confession made by appellant while he remained in the continuous custody of police officers.[13] We hold that the trial court erred in denying appellant's motion to suppress the statements he made to the officers. Accordingly, we reverse appellant's convictions and remand the case for a new trial if the Commonwealth be so advised.

Reversed and remanded.

---

[13] We do not suggest that the taint of an Edwards violation can *never* be attenuated under any circumstances; however, it is clear from the case law that the circumstances here could not and did not dissipate the taint in this case.

- 19 -

Kelsey, J., with whom McClanahan, Haley, and Beales, JJ., join, dissenting.

## I. REINITIATION FOLLOWING AN EDWARDS VIOLATION

This case illustrates well Justice Frankfurter's aphorism that "the right answer usually depends on putting the right question." Estate of Rogers v. Comm'r, 320 U.S. 410, 413 (1943). I respectfully disagree that we "need not address whether appellant's statement to Chief Marr that broke the period of silence 'reinitiated' a dialogue" with Chief Marr. *Ante* at 18. That seems to me the very question this case must answer. And the answer given by the trial judge, who heard from both Ferguson and Chief Marr on this subject, was that Ferguson — after about twenty minutes of total silence — reinitiated the dialogue. I agree with the trial court and would affirm its denial of Ferguson's suppression motion.

To begin with, Ferguson does not argue (and I would not accept it if he did) that Chief Marr's unbroken silence was the functional equivalent of an interrogation. It would take a remarkably potent — and, to date, unprecedented — legal fiction to deem an utterly mute police officer the functional equivalent of an interrogator. Although "staring silently" at a suspect may make him a bit ill at ease, it is hardly the equivalent of an interrogation. United States v. Thongsophaporn, 503 F.3d 51, 57 (1st Cir. 2007). "While silence may feel awkward or uncomfortable under some circumstances, there is no requirement that the police engage in small talk." Id.

Police officers, after all, "do not interrogate a suspect simply by hoping that he will incriminate himself." Arizona v. Mauro, 481 U.S. 520, 529 (1987); see also Jenkins v. Commonwealth, 244 Va. 445, 453, 423 S.E.2d 360, 365 (1992). Nor is the "subtle compulsion" of being confined to an "interview room," by itself, the functional equivalent of a Miranda interrogation. Gates v. Commonwealth, 30 Va. App. 352, 356, 516 S.E.2d 731, 733 (1999). "'Interrogation,' as conceptualized in the Miranda opinion, must reflect a measure of compulsion

above and beyond that inherent in custody itself." Rhode Island v. Innis, 446 U.S. 291, 300, 303 (1980) (rejecting an interpretation of Miranda "equating 'subtle compulsion' with interrogation"); see also United States v. Kimbrough, 477 F.3d 144, 149-50 (4th Cir. 2007).

To his credit, Ferguson advances his argument on appeal along a far narrower path. Ferguson admits he "did speak first" and thereby broke the long silence. See Appellant's Br. at 11.[14] He does not claim his remark was *in reply* to something Investigator Hagerman may have said prior to leaving the room. Instead, Ferguson contends only that his silence-breaking remark was simply not "a request to waive his rights or to be interrogated." Id.[15] My response to Ferguson's argument is equally simple: It does not have to be.

While an accused who clearly invokes his right to counsel is "not subject to further interrogation by authorities until counsel has been made available," Edwards v. Arizona, 451 U.S. 477, 484-85 (1981), the prophylactic bar on further interrogation lifts away when "the accused himself initiates further communication, exchanges, or conversations with the police." Medley v. Commonwealth, 44 Va. App. 19, 31, 602 S.E.2d 411, 416 (2004) (*en banc*) (quoting Commonwealth v. Gregory, 263 Va. 134, 146-47, 557 S.E.2d 715, 722 (2002), in turn quoting Edwards, 451 U.S. at 484-85). Indeed, the Court in Edwards stressed, "we do not hold or imply that Edwards was powerless to countermand his election" for counsel. Edwards, 451 U.S. at 485. For it would "make no sense to hold that once an accused has requested counsel, '[he] may

---

[14] This fact alone distinguishes Hines v. Commonwealth, 19 Va. App. 218, 221, 450 S.E.2d 403, 404 (1994), which involved an Edwards violation followed by a conversation "initiated by the police officer's further inquiry" directed to the suspect.

[15] Ferguson's *en banc* brief argues: "Although the defendant did speak first, it was not a request to waive his rights or to be interrogated. . . . A mere statement in the presence of the officer is not a waiver of the right to counsel or an indication that Ferguson wanted to make a statement or that he wanted to engage in conversation with the police concerning the offenses." Appellant's Br. at 11-12. Ferguson's reinitiation point is simply that he did not reinitiate, not that he was legally incapable of reinitiating.

never, until he has actually talked with counsel, change his mind and decide to speak with the police without an attorney being present.'" Id. at 486 n.9 (quoting in parenthetical United States v. Rodriguez-Gastelum, 569 F.2d 482, 486 (9th Cir. 1978) (*en banc*)).

The reinitiating remark by the suspect need not *itself* be an express waiver of the suspect's rights. It is enough that the remark evinces "a willingness and a desire for a generalized discussion" about the investigation. Giles v. Commonwealth, 28 Va. App. 527, 535, 507 S.E.2d 102, 107 (1998) (quoting Foster v. Commonwealth, 8 Va. App. 167, 174, 380 S.E.2d 12, 16 (1989), in turn quoting Oregon v. Bradshaw, 462 U.S. 1039, 1045-46 (1983)).

Under this standard, "a request for a drink of water or a request to use a telephone" would not qualify as a reinitiating remark. Bradshaw, 462 U.S. at 1045. But any other kind of remark would qualify if it could be "fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation." Id. So, an uninvited statement like "Well what is going to happen to me now?" constitutes a reinitiating remark. Id. at 1042. Similarly, a suspect's mere inquiry into "what was going to happen to him" would be enough to reinitiate a dialogue with police officers. Harrison v. Commonwealth, 244 Va. 576, 582-83, 423 S.E.2d 160, 164 (1992). When police officers hear such remarks, they have every right to confirm the suspect's true intentions and to inquire whether he "has changed his mind about speaking to them without an attorney." Giles, 28 Va. App. at 535, 507 S.E.2d at 107 (quoting Foster, 8 Va. App. at 174, 380 S.E.2d at 16).

In short, Ferguson's argument on appeal — that his silence-breaking remark did not constitute a "request to waive his rights or to be interrogated," Appellant's Br. at 11 — assumes too much. Under settled principles, a reinitiating remark need not go that far. It need only express "a willingness and a desire for a generalized discussion" about the investigation.

Bradshaw, 462 U.S. at 1045-46. Ferguson's uninvited remark, breaking a complete silence of about twenty minutes, fully satisfied this standard.

I also find no relevance in the assertion that Investigator Hagerman, prior to leaving Ferguson alone with Chief Marr, continued to question Ferguson after he invoked his Miranda right to counsel. *Ante* at 11-15. The trial court *suppressed* all of Ferguson's answers to these questions. The trial court's suppression order fully remedied any ostensible violation of Ferguson's Miranda rights by Hagerman.[16] Nothing in Miranda or any variant of the tainted-fruit doctrine requires the suppression of Ferguson's later confession given *after* he reinitiated a dialogue with Chief Marr and *after* he expressly waived his Miranda rights.[17]

Sitting *en banc*, we have reaffirmed that "the Miranda case, though requiring suppression of admissions unlawfully obtained, does not require that subsequent statements or their fruits be discarded as inherently tainted." Mundy v. Commonwealth, 11 Va. App. 461, 473, 390 S.E.2d 525, 531, aff'd on reh'g en banc, 399 S.E.2d 29 (1990) (adopting *en banc* "the reasons stated in the panel's majority opinion"). Instead, Mundy explained, "the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." Id. at 474, 390 S.E.2d at 532 (quoting Oregon v. Elstad, 470 U.S. 298, 309 (1985)).

---

[16] I assume *arguendo* that Ferguson was in custody to the degree required by Miranda, that his request for counsel was clear and unequivocal, and that some (but not all) of Investigator Hagerman's questions after the invocation of counsel could be characterized as continued interrogation.

[17] Reinitiation by *a suspect* can take place after an Edwards violation, even by a suspect held continuously in custody. See Height v. State, 642 S.E.2d 812, 814 (Ga. 2007) (holding that any "'taint' of the prior Edwards violation" was overcome when the accused "initiated the further discussions with police leading to the statement in question, was re-apprised of his Miranda rights in full, and signed a written waiver prior to giving his statement"); People v. Bradford, 929 P.2d 544, 566 (Cal. 1997) ("[I]f the statement made after an Edwards violation is voluntary, 'the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.'" (citation omitted)). A reinitiated interrogation *by the police*, following an Edwards violation, cannot take place absent a break in custody. Cf. *Ante* at 15 (indirectly quoting McNeil v. Wisconsin, 501 U.S. 171, 177 (1991)).

Thus, even in situations where an "officer's question during processing was improper interrogation," the fact that the suspect "initiated the later police contact eliminates any taint that might have arisen from the earlier questioning." Savino v. Murray, 82 F.3d 593, 600 (4th Cir. 1996) (rejecting habeas collateral attack of conviction upheld by Savino v. Commonwealth, 239 Va. 534, 391 S.E.2d 276 (1990)); see also Height v. State, 642 S.E.2d 812, 814 (Ga. 2007).

Properly framed, then, the question we face "is whether a statement made in violation of Edwards taints a subsequent confession not made in violation of Edwards." See Howard v. Moore, 131 F.3d 399, 414 n.16 (4th Cir. 1997). Absent some evidence that the subsequent confession was truly involuntary — and none is alleged here — the answer is no.

## II. SEIBERT'S INAPPLICABLE PLURALITY OPINION

This case also demonstrates how *not* to read plurality opinions of the United States Supreme Court. The majority in our case states Missouri v. Seibert, 542 U.S. 600 (2004), "found" that "a twenty-minute break in questioning" separating an un-Mirandized confession from a later, nearly identical, Mirandized confession rendered both subject to the exclusionary rule. *Ante* at 13. "The same rationale applies in the instant case," the majority concludes. Id. at 14.

This reasoning, however, collapses upon its first premise. The plurality opinion in Seibert was the opinion of four of nine Justices. "Because Seibert is a plurality decision and Justice Kennedy concurred in the result on the narrowest grounds, it is his concurring opinion that provides the controlling law." United States v. Street, 472 F.3d 1298, 1313 (11th Cir. 2006) (citing Romano v. Oklahoma, 512 U.S. 1, 9 (1994); Marks v. United States, 430 U.S. 188, 193 (1977); United States v. Gonzalez-Lauzan, 437 F.3d 1128, 1136 n.6 (11th Cir. 2006)); see United

States v. Mashburn, 406 F.3d 303, 308-09 (4th Cir. 2005).[18]  This point is not a digression

unique to Seibert but a larger principle central to the proper understanding of stare decisis.

"When a fragmented Court decides a case and no single rationale explaining the result enjoys the

assent of five Justices, the holding of the Court may be viewed as that position taken by those

Members who concurred in the judgments on the narrowest grounds."  Mashburn, 406 F.3d at

308 (quoting Marks, 430 U.S. at 193); see also Panetti v. Quarterman, 127 S. Ct. 2842, 2856

(2007) ("When there is no majority opinion, the narrower holding controls.").

By citing, quoting, and relying upon the reasoning of the four-Justice plurality in Seibert

as authoritative — instead of the narrower reasoning of Justice Kennedy's concurrence — the

majority in our case misapplies settled principles of stare decisis. *Ante* at 13-15.  The error is of

no small moment because the Seibert plurality sought to greatly limit the continuing precedential

effect of Oregon v. Elstad, 470 U.S. 298 (1985).  Elstad held that "subsequent administration of

Miranda warnings to a suspect who has given a voluntary but unwarned statement ordinarily

should suffice to remove the conditions that precluded admission of the earlier statement."  Id. at

314.  Under Elstad, the only "relevant inquiry is whether, in fact, the second statement was also

voluntarily made.  As in any such inquiry, the finder of fact must examine the surrounding

---

[18] See also United States v. Carter, 489 F.3d 528, 535 (2d Cir. 2007); United States v. Courtney, 463 F.3d 333, 338 (5th Cir. 2006) ("[W]e find Seibert's holding in Justice Kennedy's opinion concurring in the judgment."); United States v. Ollie, 442 F.3d 1135, 1142 (8th Cir. 2006); United States v. Williams, 435 F.3d 1148, 1158 (9th Cir. 2006) (holding the "narrower test" of Justice Kennedy's concurrence "represents Seibert's holding"); United States v. Kiam, 432 F.3d 524, 532-33 (3d Cir. 2006) (applying "the Seibert plurality opinion as narrowed by Justice Kennedy"); United States v. Naranjo, 426 F.3d 221, 231-32 (3d Cir. 2005); United States v. Black Bear, 422 F.3d 658, 664 (8th Cir. 2005); United States v. Stewart, 388 F.3d 1079, 1086-90 (7th Cir. 2004); United States v. Stewart, 388 F.3d 1079, 1090 (7th Cir. 2004); People v. Loewenstein, 883 N.E.2d 690, 697 (Ill. App. Ct. 2008); Ford v. United States, 931 A.2d 1045, 1051-52 (D.C. 2007); State v. Pitts, 936 So. 2d 1111, 1136 (Fla. Dist. Ct. App. 2006); Cooper v. State, 877 A.2d 1095, 1107 (Md. Ct. Spec. App. 2005).

circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements." Id. at 318.

In contrast to Siebert's plurality opinion, Justice Kennedy's concurrence did not sideline Elstad or cast any doubt on its continuing precedential value. Instead, the concurrence recognized a *narrow* exception to Elstad "applicable only in the *infrequent* case" where the police have used "a two-step questioning technique based on a *deliberate violation* of Miranda." Seibert, 542 U.S. at 620-22 (Kennedy, J., concurring in judgment) (emphasis added). In this respect, "Seibert, rather than overruling Elstad, carved out an exception to Elstad for cases in which a *deliberate*, two-step strategy was used by law enforcement to obtain the postwarning confession." United States v. Carter, 489 F.3d 528, 535-36 (2d Cir. 2007) (emphasis added) (joining "all of our sister circuits that have decided the issue" in holding that "Siebert lays out an exception to Elstad").[19]

In a footnote, *ante* at 13 n.9, the majority defends its reliance on the four-Justice Seibert opinion on the ground that Justice Kennedy agreed with the plurality's assertion that the twenty-minute period did not convert the episode into two wholly separate interrogations. Maybe so, but this benign observation leads to no end. The point of Justice Kennedy's concurrence is that, absent proof of a deliberate effort by police interrogators to thwart Miranda, the curative principle of Elstad holds true *even in* the context of a single interrogation where the constitutional violation takes place only twenty minutes prior to the voluntary, fully-warned, confession. In other words, had Seibert *not* been a case "in which the two-step interrogation

---

[19] See also Courtney, 463 F.3d at 338 ("Seibert requires the suppression of a post-warning statement only where a deliberate two-step strategy is used and no curative measures are taken; where that strategy is not used, [the admissibility] 'continue[s] to be governed by the principles of Elstad.'" (citation omitted)); Kiam, 432 F.3d at 532 ("Once we determine that the Miranda violation was not deliberate, we must fall back on Elstad as instructed by Justice Kennedy.").

technique was used in a calculated way to undermine the <u>Miranda</u> warning," <u>Seibert</u>, 542 U.S. at 622, Justice Kennedy would have *not* voted to reverse the conviction. The plurality's failure to differentiate between "intentional and unintentional two-stage interrogations," Justice Kennedy explained, "cuts too broadly." <u>Id.</u> at 621-22. It was for this reason that Justice Kennedy (unlike Justice Breyer) concurred not in the plurality's reasoning, but only in its result. <u>Cf.</u> <u>id.</u> at 617 (Breyer, J., "concurring"), with <u>id.</u> at 618 (Kennedy, J, "concurring in the judgment").

In our case, Ferguson did not argue in the trial court that the police *deliberately* tricked him into confessing by obtaining an incriminating statement in violation of <u>Miranda</u> and then waiting in silence for twenty minutes for his expected reinitiation in order to set up another <u>Miranda</u> waiver opportunity. Nor did Ferguson make that argument on appeal either before the panel or the *en banc* Court. To be sure, Ferguson has not once cited <u>Seibert</u> in any brief, at any stage, of this case.

In sum, the majority's misreading of <u>Siebert</u> serves only to compound its error in failing to address the one truly dispositive question in this case: Did Ferguson reinitiate a conversation with police and thereafter voluntarily waive his <u>Miranda</u> rights?

Because he did both, I respectfully dissent.